UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| MAX PIEKKOLA, | 4:15-CV-04148-KES |
| Plaintiff, | |
| vs. | ORDER DISMISSING COMPLAINT IN PART AND DIRECTING SERVICE OF COMPLAINT |
| MARTIN JACKLEY, Attorney General of South Dakota, individual and official capacities; BRYAN GORTMAKER, Special Assistant Attorney General, individual and official capacities; GRETCHEN SLATE, Special Assistant Attorney General, individual and official capacities; DENNIS KAEMINGK, Secretary of the South Dakota Department of Corrections, individual and official capacities; J.C. SMITH, Regional Supervisor, South Dakota Parole Services, individual and official capacities; SAM BADURE, Case Manager for the DOC at the South Dakota State Penitentiary, individual and official capacities; ROBERT DOOLEY, Director of Prison Operations for the DOC, individual and official capacities; HUNTER SUMMERS, Special Security Lieutenant, South Dakota State Penitentiary, individual and official capacities; JOSH KLIMEK, Unit Manager, Mike Durfee State Prison, individual and official capacities; TAMMY DEJONG, Unit Coordinator, Mike Durfee State Prison, individual | |

and official capacities;
TRAVIS TJEERDSMA, Case Manager,
Mike Durfee State Prison, individual
and official capacities;
KELLY TJEERDSMA, Corporal, Mike
Durfee State Prison, individual and
official capacities;
DUSTIN TJEERDSMA, Correctional
Officer, Mike Durfee State Prison,
individual and official capacities;
LEE KAUFENBERG, Special Security
Captain, Mike Durfee State Prison,
individual and official capacities;
LYLE STOCK, Sergeant, Mike Durfee
State Prison, individual and official
capacities; and
STEVE REYNOLDS, previous supervisor
of the automotive program, Mike Durfee
State Prison, individual and official
capacities,

Defendants.

## INTRODUCTION

Plaintiff, Max Piekkola, filed this lawsuit pursuant to 42 U.S.C. § 1983,
naming Martin Jackley, Gretchen Slate, Dennis Kaemingk, J.C. Smith, Sam
Badure, Robert Dooley, Hunter Summers, Josh Klimek, Tammy DeJong, Travis
Tjeerdsma, Kelly Tjeerdsma, Dustin Tjeerdsma, Lee Kaufenberg, Lyle Stock,
and Steve Reynolds as defendants. Piekkola is an inmate at Mike Durfee State
Prison (MDSP) in Springfield, South Dakota. The court "screened" this
complaint pursuant to 28 U.S.C. § 1915A and dismisses it in part for failure to
state a claim upon which relief may be granted pursuant to 28 U.S.C.
§§ 1915(e)(2)(B)(ii) & 1915A(b)(1).

## FACTUAL BACKGROUND

According to the complaint, in 2011, Piekkola was an inmate at MDSP. Docket 1 at ¶22. While incarcerated, Piekkola went through chemical dependency treatment with counselor Karri Reynolds. *Id.* In October 2011, Piekkola was paroled to Community Transition Program. *Id.* at ¶23. After being paroled in October of 2011, Piekkola began a relationship with Karri. *Id.* at ¶24. Before this relationship began, Karri quit working for the South Dakota Department of Social Services (DSS). *Id.* at ¶25. During the relationship, Karri was married to Steve Reynolds, an MDSP employee and a defendant in this action, but they were in the process of obtaining a divorce. *Id.* at ¶33.

The remaining background arises from three different arrests and their aftermath, one each in 2011, 2012, and 2015. In October or November 2011, Piekkola was arrested under parole officer defendant Badure's order. *Id.* at ¶26. At the time of the arrest, Badure was investigating Karri for a crime she allegedly committed while employed at DSS. *Id.* Piekkola was not under investigation and alleges that there was no cause to believe he had committed a crime. *Id.* at ¶26. Department of Corrections found no basis for charging Karri after she passed a polygraph. *Id.* at ¶27.

While Piekkola was incarcerated on the parole detainer, defendant Summers seized his phone, searched the hard drive, and responded to texts as if he was Piekkola. *Id.* at ¶28. Summers did not have a warrant for this search. *Id.* During this time, 2011-12, defendants Kaufenberg, Travis Tjeerdsma, Kelly

3

Tjeerdsma, Dustin Tjeerdsma, and Reynolds sent harassing and threatening messages to both Karri and Piekkola. *Id.* at ¶29.

In April 2012, Piekkola was arrested for driving under the influence and incarcerated in the South Dakota State Penitentiary (SDSP). *Id.* at ¶30. After Piekkola's arrest, Reynolds told Karri that he had offered to pay prisoners to attack Piekkola. *Id.* at ¶31. Piekkola told Associate Warden Jennifer Wagner about this threat. *Id.* at ¶32. Wagner placed an administrative override on Peikkola that kept him from being transferred to MDSP. *Id.* Instead, Piekkola was sent to a minimum custody facility in Sioux Falls, South Dakota. *Id.*

During this time, Reynolds and Karri were going through a divorce. *Id.* at ¶33. Piekkola spoke to Karri every day on the telephone. *Id.* Kaufenberg accessed recordings of these calls and shared them with Reynolds. *Id.* Kaufenberg also allowed Reynolds access to Piekkola's institutional file. *Id.*

On October 31, 2013, Piekkola was granted parole. *Id.* at ¶34. The parole board approved a plan that included Piekkola living with Karri. *Id.* After Piekkola's release, Reynolds continued to send harassing and threatening messages to Piekkola and Karri. *Id.* at ¶35. In 2014, while working at MDSP, Reynolds made numerous negative remarks about Piekkola, including what Piekkola had done to Karri, Reynolds, and their families. *Id.* at ¶36. Piekkola alleges that these were lies. *Id.* Steve Reynolds also made more offers to pay inmates to attack Piekkola. *Id.* at ¶37. Defendants Dooley, Kaufenberg, and Tjeerdsma (the complaint does not specify which Tjeerdsma) were aware of these threats. *Id.* In January 2015, Reynolds resigned from MDSP. *Id.* at ¶38.

4

In June 2015, Piekkola was arrested for "absconding from parole supervision" and was returned to SDSP. *Id.* at ¶39. Piekkola met with an admissions case manager who was aware of his situation and thought Piekkola should not be sent to MDSP. *Id.* at ¶40. The case manager applied for another administrative override; it was denied. *Id.* Karri called Warden Darin Young and explained the threats against Piekkola. *Id.* at ¶41. Warden Young said he was aware of the situation but assured Karri that Piekkola would be safe and there would be no retaliation because Reynolds had resigned. *Id.*

On June 15, 2015, Piekkola was transfered to MDSP. *Id.* at ¶42. During his orientation, a prison staff member used Piekkola as an example of how not to do time at MDSP. *Id.* On July 8, 2015, Piekkola spoke to Dooley and explained his concerns. *Id.* at ¶43. Dooley said he was aware of the situation and told Piekkola to speak to defendant Klimek or use the administrative remedies. *Id.* Piekkola attempted to utilize the administrative remedy system. *Id.* at ¶44. He outlined his issues in an informal request but was placed in administrative detention by DeJong and Tjeerdsma (the complaint does not specify which Tjeerdsma) for making the request. *Id.* He was released after one week without being given a disciplinary report or a reason for his detention. *Id.* He was, however, harassed while in detention by both DeJong and Tjeerdsma for his relationship with Karri. *Id.* at ¶45.

A few days later, Piekkola was issued a major rule infraction for unauthorized contact with a former employee. *Id.* at ¶46. Piekkola alleges that this must have referred to Karri and was issued by DeJong. *Id.* Piekkola argues

that Karri was never a DOC employee; she worked for DSS. *Id.* at ¶47. Piekkola and Karri had been in contact with each other previously without objection by DOC employees or the parole board. *Id.* at ¶48.

Klimek conducted a Unit Disclpinary Committee (UDC) hearing about phone calls between Piekkola and Karri. *Id.* at 49. Klimek offered Piekkola a deal with less punishment. *Id.* Piekkola refused and requested a DHO hearing. *Id.* During this hearing, defendant Stock found Piekkola guilty without presenting evidence that Piekkola contacted Karri or that he was not allowed to contact her. *Id.* at ¶52. Piekkola alleges that Stock was not an impartial decision maker because Stock previously had made sexual advances to Karri. *Id.* at ¶¶50, 51. Piekkola was fined $50 and lost his phone privileges for sixty days. *Id.* at ¶52. Immediately after this hearing, DeJong deactivated Piekkola's account. *Id.* at ¶53. He was warned that further contact with Karri in any form would result in serious consequences. *Id.* at ¶54.

In August 2015, Piekkola was again placed in administrative detention. *Id.* at ¶55. In his disciplinary report, DeJong said Piekkola had used the phone, even though she had made that impossible by deactivating his account. *Id.* Again, Klimek conducted a UDC hearing. *Id.* at ¶56. This time Piekkola accepted a deal because he had been punished so severely by an allegedly biased arbiter in the previous DHO hearing. *Id.* at ¶¶56, 57.

Piekkola is represented by attorney James Even in an unrelated matter. *Id.* at ¶58. Piekkola has not been able to contact Even due to his phone restriction, even though he has repeatedly requested leave to contact Even. *Id.*

6

at ¶¶58, 59. Defendants also attempted to ensure that a money order sent by Even on September 2, 2015, was not received by Piekkola. *Id.* at ¶61. DeJong, Klimek, and Kaufenberg told Piekkola that Even would have to submit to an extensive background check in order to send money to Piekkola. *Id.* at ¶62. Even's personal identifiers would then be available to all DOC staff. *Id.*

On September 11, 2015, Piekkola and another inmate were summoned to DeJong's office. *Id.* at ¶63. DeJong and Klimek told the other inmate they thought he was helping Piekkola with his legal action, and he would be severely punished if he assisted Piekkola. *Id.*

Since July, Piekkola has sent numerous requests to meet with the prison contracted attorney, but they have been ignored. *Id.* at ¶64. Piekkola has sent five requests for case law, but these have also been ignored. *Id.* These requests are allegedly processed by Klimek, DeJong, and Tjeerdsma (the complaint does not specify which Tjeerdsma). *Id.*

On September 21, 2015, Piekkola filed this complaint. Docket 1. He raises seven claims. *Id.* In relief, Piekkola requests damages and equitable remedies. *Id.* For the reasons stated below, Piekkola's complaint is dismissed in part and survives screening in part.

## LEGAL STANDARD

The court must assume as true all facts well pleaded in the complaint. *Estate of Rosenberg by Rosenberg v. Crandell*, 56 F.3d 35, 36 (8th Cir. 1995). Civil rights and pro se complaints must be liberally construed. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Bediako v. Stein Mart, Inc.,* 354 F.3d 835, 839

7

(8th Cir. 2004). Even with this construction, "a pro se complaint must contain specific facts supporting its conclusions." *Martin v. Sargent*, 780 F.2d 1334, 1337 (8th Cir. 1985); *Ellis v. City of Minneapolis*, 518 F. App'x 502, 504 (8th Cir. 2013).

A complaint "does not need detailed factual allegations . . . [but] requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). If it does not contain these bare essentials, dismissal is appropriate. *Beavers v. Lockhart*, 755 F.2d 657, 663 (8th Cir. 1985). *Bell Atlantic* requires that a complaint's factual allegations must be "enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true." *Id.* at 1965; *see also Abdullah v. Minnesota,* 261 F. App'x. 926, 927 (8th Cir. 2008) (citing *Bell Atlantic* noting complaint must contain either direct or inferential allegations regarding all material elements necessary to sustain recovery under some viable legal theory).

## DISCUSSION

Piekkola claims he was illegally incarcerated, he was subjected to an illegal search and seizure, his right to privacy was violated, his right to association was violated, he was deprived of property without due process, he was denied access to the courts, and he was defamed. Docket 1. Piekkola also claims defendants retaliated against him for exercising these rights. *Id.*

It is impossible to calculate the exact amount he requests in damages, but it is at least $750,000, jointly and severally against each defendant. *Id.* at

8

¶¶ 152-58. He also requests a declaration that his rights were violated and his character was defamed. *Id.* at ¶¶ 148, 149. Finally, he requests injunctive relief to stop defendants from interfering with the exercise of his constitutional rights and from retaliating against him for exercise of his rights. *Id.* at ¶¶ 150, 151.

## I.  Supervisory Liability

Many of Piekkola's claims present supervisory liability issues. He names Kaemingk and Dooley as defendants in multiple claims because they are responsible for the overall operation of prisons in South Dakota. Docket 1 at ¶¶ 74-75, 85-86, 101-102,113-14, 125-26, 137-38, 146-47. "[V]icarious liability is inapplicable to § 1983 suits[.]" *Parrish v. Ball*, 594 F.3d 993, 1001 (8th Cir. 2010). "[E]ach Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)). A supervisor's liability must be based on his or her own "deliberate indifference or tacit authorization." *Grayson v. Ross*, 454 F.3d 802, 811 (8th Cir. 2006) (quoting *White v. Holmes*, 21 F.3d 277, 280 (8th Cir. 1994)). Kaemingk and Dooley cannot be held liable merely because of their roles as supervisors.

Piekkola claims Kaemingk and Dooley are "liable under failure to train, deliberate indifference, and practices/policies theories of liabilities." Docket 1 at ¶¶ 74-75, 85-86, 101-102,113-14, 125-26, 137-38, 146-47.

> In limited circumstances, a local government may be liable for its decision not to train certain employees about their legal duty to avoid violating citizens' rights. . . . A pattern of similar constitutional violations by untrained employees is ordinarily necessary to show deliberate indifference. It may be, however, that

> evidence of a single violation of federal rights, accompanied by a
> showing that a municipality has failed to train its employees to
> handle recurring situations presenting an obvious potential for
> such a violation, could trigger municipal liability.

*Folkerts v. City of Waverly, Iowa*, 707 F.3d 975, 982 (8th Cir. 2013) (citations

and quotations omitted). Piekkola's claim does not allege facts to support his

allegation that the training was inadequate, that Kaemingk and Dooley acted

indifferently, or that the policies violated his constitutional rights. These claims

are "merely conclusory" and therefore insufficient to state a claim. *Davis v.

Hall*, 992 F.2d 151, 152 (8th Cir. 1993); *Parker v. Porter*, 221 F. App'x 481, 482

(8th Cir. 2007). Defendants Kaemingk and Dooley[1] are dismissed from all

claims without prejudice.

## II.    Illegal Incarceration, Due Process, Cruel and Unusual Punishment, and Retaliation

Piekkola claims his 2011 arrest was illegal. He makes this claim against

defendants Jackley, Gortmaker, Slate, Smith, and Badure. Docket 1 at ¶65. He

claims he was not under investigation, there was no probable cause to arrest

him, and there was no reasonable suspicion that he violated his parole. *Id.* at

¶¶68-70. He claims DCI was investigating Karri, and it was easier to investigate

her alleged crimes by arresting him without probable cause. *Id.* at ¶67.

Under *Heck v. Humphrey*, 512 U.S. 477 (1994), a state prisoner cannot

use a § 1983 action to challenge his confinement. "When 'a judgment in favor

of the plaintiff would necessarily imply the invalidity of his conviction or

---

[1] Although Kaemingk and Dooley are named as defendants in multiple claims, the court
will not identify Kaemingk and Dooley as named defendants or discuss their liability in the
following sections because their potential liability has been fully discussed here.

sentence' . . . § 1983 is not an available remedy." *Skinner v. Switzer*, 562 U.S. 521, 533 (2011) (quoting *Heck*, 512 U.S. at 487).

Count I is barred by *Heck*. Piekkola's claim is mainly conclusory, and it is not clear what part of the revocation proceeding he is complaining about. Piekkola does not request a new hearing or a different kind of hearing. *See* Docket 1 at ¶¶148-161. Instead, he requests that the court invalidate as illegal his arrest and the resulting incarceration. Because this claim is barred by *Heck*, it is dismissed pursuant to §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

### III.   Unreasonable Search and Seizure

Piekkola claims Summers violated his Fourth Amendment rights by searching his phone. Piekkola was incarcerated in 2011 on a parole detainer. Docket 1 at ¶79. Summers took his phone, searched its contents, and responded to text messages while pretending to be Piekkola. *Id.* Piekkola claims there was no warrant for this search. *Id.* at ¶80. The court will consider the claim with respect to Summers. The Supreme Court analyzed the constitutionality of a county jail's policy requiring strip searches of all detainees in *Florence v. Bd. of Chosen Freeholders of Cty. of Burlington*, 132 S. Ct. 1510 (2012). The Court held this policy constitutional. *Id.* The holding was based on the recognition that "correctional officials must be permitted to devise reasonable search policies to detect and deter the possession of contraband in their facilities." *Id.* at 1517. Correctional officials are given wide latitude to create policies in the interest of their facilities' security. *Id.*

In *Riley v. California*, 134 S. Ct. 2473 (2014), the Court analyzed the constitutionality of the search of a cell phone as a search incident to arrest. One of the defendants was convicted after police seized his cell phone, searched it, used the information to find his house, searched the house, and found drugs. *Id.* at 2480. Two hours after the arrest, a detective further examined the phone looking for videos and pictures. *Id.* at 2480-81.

The Court held police officers must generally secure a warrant before searching a cell phone. *Id.* at 2485. This holding was based on the fact that cell phones hold a vast amount of personal data, more analogous to the contents of a house than the contents of a pocket. *Id.* at 2490-91. The Court discussed two exceptions to the general need for a warrant: the safety of arresting officers and the destruction of evidence. The Court held that neither applies to a cell phone seized by an officer. *Id.* Finally, the Court explained that, even though "an arrestee has diminished privacy interests, . . . when 'privacy-related concerns are weighty enough' a 'search may require a warrant, notwithstanding the diminished expectations of privacy of the arrestee.' " *Id.* at 2488 (quoting *Maryland v. King*, 133 S.Ct. 1958, 1979 (2013)).

Piekkola claims that his phone was illegally seized and searched. The seizure of the phone was reasonable, as the Court found in *Riley*, and did not violate Piekkola's Fourth Amendment rights. The search, however, violated his rights. Jail officials are given broad discretion to search detainees, as the court explained in *Florence*. According to the complaint, however, the phone was

12

already in possession of jail staff. It presented no danger in itself, and a search was not supported by the need to keep contraband from entering the jail.

Further, Summers' actions make the search seem all the less constitutional. " '[T]he ultimate touchstone of the Fourth Amendment is reasonableness.' " *Id.* at 2482 (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)). The constitutionality of the search of Piekkola's cell phone is suspect, but responding to messages while pretending to be Piekkola shows that Summers' search of the phone may have been unreasonable. Piekkola states a claim that Summers violated his Fourth Amendment rights. This claim survives screening under § 1915A.

## IV.    Right to Privacy

Piekkola claims defendants Kaufenberg, Travis Tjeerdsma, Kelly Tjeerdsma, Dustin Tjeerdsma, and Reynolds violated his right to privacy by accessing and disclosing his personal information, which included "alcohol/drug treatment records, medical information, and mental health records." Docket 1 at ¶¶89-90. He claims, "[D]efendants used the information to make uncouth statements regarding Piekkola to Karri Reynolds and others." *Id.* at ¶91.

The Eighth Circuit has recognized generally that the "Constitution protects individuals against invasion of their privacy by the government." *McCaslin v. Campbell*, No. 95–4041, 1997 WL 148824, at *2 (8th Cir. April 2, 1997). "Th[e] protection against public dissemination of information is limited and extends only to highly personal matters representing 'the most intimate

aspects of human affairs.' " *Id.* (quoting *Eagle v. Morgan*, 88 F.3d 620, 625 (8th Cir. 1996)). "[T]o violate the constitutional right of privacy the information disclosed must be either a shocking degradation or an egregious humiliation ..., or a flagrant bre[a]ch of a pledge of confidentiality which was instrumental in obtaining the personal information." *Van Zee v. Hanson*, 630 F.3d 1126, 1128 (8th Cir. 2011) (quoting *Cooksey v. Boyer*, 289 F.3d 513, 516 (8th Cir. 2002)).

Prisoners' privacy rights, however, are diminished due to their status. *See Hudson v. Palmer*, 468 U.S. 517, 526 (1984) ("The recognition of privacy rights for prisoners in their individual cells simply cannot be reconciled with the concept of incarceration and the needs and objectives of penal institutions"); *Hill v. McKinley*, 311 F.3d 899, 904 (8th Cir. 2002) (agreeing with the general statement of law that "prison officials must balance an inmate's right to privacy with the security needs of the institution"). The Eighth Circuit Court of Appeals has not decided whether prison records are the type of personal information protected under *McCaslin* and *Van Zee*.

The Eighth Circuit has ruled on similar issues though. The court held that in 1991, there was "no clearly established constitutional right to non-disclosure of HIV status." *Tokar v. Armontrout*, 97 F.3d 1078, 1084 (8th Cir. 1996). But the *Tokar* holding was limited. The court stated: "[W]e hold that the district court did not err in granting appellees' motion for summary judgment. We do so simply because Tokar either failed to allege constitutional violations

14

or set forth evidence sufficient to create triable issues of fact. On another record, the result could have been different." *Id.* at 1085.

In *Beers v. Stockton*, No.00-1119, 2000 WL 1839535 (8th Cir. 2000) the court affirmed the denial of a prisoner's right to privacy claim when a prison nurse released his medical records to nonmedical prison staff of a prison where he was being transferred. The court specifically noted that release to nonmedical staff, in Beers' case, "was related to penological concerns." *Id.* at *1.

The majority of other circuits that have ruled on this issue have found a limited right to privacy. The Third, Second, and Sixth Circuits have found there is a limited right to privacy in this situation. *See Powell v. Schriver*, 175 F.3d 107, 112 (2d Cir. 1999) (holding that "the gratuitous disclosure of an inmate's confidential medical information as humor or gossip . . . is *not* reasonably related to a legitimate penological interest, and it therefore violates the inmate's constitutional right to privacy"); *Doe v. Delie*, 257 F.3d 309, 317 (3d Cir. 2001) (holding that a prisoner's right to privacy in his HIV-positive status is "not fundamentally inconsistent with incarceration," and "the constitutional right to privacy in one's medical information exists in prison"); *Moore v. Prevo*, 379 F. App'x 425, 428 (6th Cir. 2010) (holding "inmates have a Fourteenth Amendment privacy interest in guarding against disclosure of sensitive medical information from other inmates subject to legitimate penological interests").

In an older case, the Seventh Circuit held that prisoners do not have a constitutional right to the confidentiality of their medical records under the

general right of privacy. *Anderson v. Romero*, 72 F.3d 518, 523 (7th Cir. 1995). The Eleventh Circuit has not addressed the issue. *See Kahlout v. Jefferson Cty. Jail*, No. 2:14-CV-1126-KOB-TMP, 2015 WL 4032148, at *5 (N.D. Ala. June 30, 2015) ("There are no Supreme Court opinions or published opinions in this Circuit recognizing a prisoner's constitutional right to privacy in his mental health records").

In *Smith v. Neb. State Penitentiary*, No. 4:09CV3257, 2010 WL 829010 (D. Neb. Mar. 3, 2010), the district court held that, even if the right did exist, plaintiff's complaint was dismissed. The court held that the prisoner failed to state a claim because he did not specify what confidential medical information was disclosed or allege that the disclosure was unrelated to a penological interest. Piekkola, on the other hand, specifies at least one person to whom defendants disclosed his private information. Docket 1 at ¶91. He also alleges that there was no penological interest to justify defendants' access to and disclosure of the medical information, and he articulates a reasonable explanation as to why defendants may have violated his rights. *Id.* at ¶92.

At the very least, it is inappropriate to dismiss Piekkola's claim under § 1915A. The relative silence from the Eighth Circuit does not mean that Piekkola has not stated a claim that survives § 1915A screening. *See Alfred v. Corr. Corp. of Am.*, 437 F. App'x 281, 287 (5th Cir. 2011) (explaining that "[t]he fact that there is not an absolute right to this privacy protection says nothing about whether there is, in fact, such a right in this particular case," and holding that this lack of an absolute right does not show that plaintiff's legal

argument is baseless). Further, legitimate penological interest is the bedrock of prison litigation. See *Turner v. Safley*, 482 U.S. 78, 89 (1987) ("when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests"). Taking Piekkola's complaint as true, the information was accessed and disclosed for extremely inappropriate reasons. At this stage, these allegations belie any argument that the access and disclosure of Piekkola's records was due to a legitimate peneological interest. Piekkola states a claim on which relief may be granted, and survives screening.

### V.      Right to Associate

Piekkola claims that defendants Klimek, Dejong, Travis Tjeerdsma, and Stock violated his constitutional rights by denying him contact with Karri. He claims he is not allowed to call her or contact her in any way. The Eighth Circuit analyzed prisoner phone use in *Benzel v. Grammer*, 869 F.2d 1105 (8th Cir. 1989). *Benzel* analyzed a prison regulation that required prisoners to submit a list of people they wanted to call and restricted calls to those people. *Id.* at 1107. The court held, "A prisoner has no right to unlimited telephone use." *Id.* at 1108. "Although in some instances prison inmates may have a right to use the telephone for communication with relatives and friends, prison officials may restrict that right in a reasonable manner, 'subject to rational limitations in the face of legitimate security interest of the penal institution.' " *Id.* (quoting *Hutchings v. Corum*, 501 F.Supp. 1276, 1296 (W.D. Mo. 1980). The court applied *Turner* to determine the reasonableness of the regulation.

17

In *Holloway v. Magness*, 666 F.3d 1076 (8th Cir. 2012), the court explained, "[T]he extent of inmates' First Amendment right to communicate with the outside world is a fact-intensive universe." *Id.* at 1079. Here, Piekkola claims that he is being denied contact with Karri without a legitimate reason and provides possible illegitimate reasons to explain the denial. A more fact-intensive discussion is impossible at this stage. Piekkola has provided enough to state a claim on which relief may be granted.

Piekkola also raises a claim for retaliation based on exercising his right to associate with Karri. To state a claim of retaliation for exercising a First Amendment right, Piekkola must show (1) he engaged in a protected activity; (2) defendants took adverse action against him that would chill a person of ordinary firmness from continuing in the activity; and (3) the adverse action was motivated at least in part by the exercise of the protected activity. *Santiago v. Blair*, 707 F.3d 984, 991 (8th Cir. 2013). According to the complaint, Piekkola was placed in administrative detention, was harassed while there, was punished after a prison hearing, and had his phone account deactivated because he tried to communicate with Karri. Docket 1 at ¶¶44-45, 49-57. The retaliation claim adequately alleged that Piekkola's communication with Karri is protected, it is being unconstitutionally restricted, and the restriction occurred because Piekkola was trying to exercise his constitutional rights. Therefore, Piekkola's claim for retaliation survives screening under § 1915A.

## VI.     Deprivation of Property Without Due Process

Piekkola claims Klimek, Dejong, and Stock violated his due process rights by punishing him without presenting evidence. The Supreme Court held "challenged prison conditions cannot give rise to a due process violation unless those conditions constitute 'atypical and significant hardship[s] on [inmates] in relation to the ordinary incidents of prison life.' " *McKune v. Lile*, 536 U.S. 24, 37 (2002) (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)).

In *Phillips v. Norris*, 320 F.3d 844 (8th Cir. 2003), an inmate was caught using illegal tobacco and was put in isolation. Initially, he was charged with a rule violation. *Id.* at 846. He filed a § 1983 action and argued that the denial of a hearsing so he could respond to the charges and the resulting punishment represented an "atypical hardship" and violated his due process rights. *Id.* The court held that no due process violation occurred. *Id.* at 847. "In order to prevail on a Fourteenth Amendment due process claim, [a plaintiff] must first demonstrate that he was deprived of life, liberty or property by government action." *Id.* (citing *Singleton v. Cecil*, 155 F.3d 983, 987 (8th Cir. 1998); *Beverati v. Smith*, 120 F.3d 500, 502 (4th Cir. 1997)). Piekkola was not denied life or property. Therefore, "he must identify a liberty interest in order to sustain his due process claim." *Id.* at 847.

> Prisoners' liberty interests created by the state are
>
> generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.

19

*Id.* (citing *Sandin*, 515 U.S. at 483–84). In order to determine whether an inmate possesses a liberty interest, the court must compare the conditions of confinement in segregation with those in ordinary prison life. *Id.* (quoting *Beverati*, 120 F.3d at 503). When conducting this comparison, the court does not consider "the procedures used to confine the inmate in segregation." *Id.* Piekkola's claim only concerns the procedures used to punish him, not the punishment itself. Therefore, he fails to state a claim on which relief may be granted. This claim is dismissed pursuant to § 1915A.

Piekkola does not state a claim for retaliation under this section. Any claim of retaliation for contact with Karri was dealt with in section V.

### VII.   Access to Courts and Right to Counsel

Piekkola claims that Kaufenberg, Klimek, and Dejong violated his right of access to courts and retaliated against him. Liberally construed, he makes four claims: he was denied access to his attorney by revocation of his phone privileges, defendants stopped his attorney from sending him money, he was denied requests for case law, and an inmate who helped him with his legal research was threatened by defendants. Docket 1 at ¶¶129-33.

These claims allege violations of the First Amendment right to access the courts. "To prove a violation of the constitutional right, an inmate must show an 'actual injury' by 'demonstrat[ing] that the alleged shortcomings' in prison resources 'hindered his efforts to pursue a legal claim.'" *Bear v. Fayram*, 650

F.3d 1120, 1123 (8th Cir. 2011) (quoting *Lewis v. Casey*, 518 U.S. 343, 351 (1996)). Because Piekkola has not alleged actual injury, the claims fail.

These claims may also allege violations of the Sixth Amendment right to counsel. The Sixth Amendment guarantees assistance of counsel for defense in "all criminal prosecutions . . . ." U.S. Const. amend. VI. Piekkola's claim concerns representation in a pending settlement. See Docket 1 at ¶130. Because the pending settlement is not related to a criminal prosecution, Piekkola has no constitutional right to counsel. Thus, this claim fails to state a claim and is dismissed pursuant to § 1915A.

### VIII.  Defamation

Piekkola claims Travis Tjeerdsma, Kelly Tjeerdsma, Dustin Tjeerdsma, and Reynolds defamed him and damaged his reputation. He brings this claim under state law. This court has jurisdiction over Piekkola's state-law defamation claim pursuant to 28 U.S.C. § 1367(a). "The district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." *Id.* In this case, the federal and state claims "derive from a common nucleus of operative fact," so exercising supplemental jurisdiction is appropriate. *McRaven v. Sanders*, 577 F.3d 974, 984 (8th Cir. 2009) (citing *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966)).

Under South Dakota law, defamation consists of either libel or slander. *Guilford v. Nw. Pub. Serv.*, 581 N.W.2d 178, 180 (S.D. 1998) (citing SDCL

20-11–2). "Slander is a false and unprivileged publication, other than libel, which . . . [b]y natural consequence, causes actual damage." SDCL 20-11-4. Piekkola alleges that defendants "regularly made false verbal and written statements," including that he "was a thief, an alcohol/drug addict, a physically assaultive person among other things." Docket 1 at ¶141. Piekkola states a claim upon which relief may be granted. This claim survives screening under § 1915A.

### IX.    Motion to Extend

Piekkola also moves this court to extend the deadline to pay his initial filing fee. Docket 8. Because he has already paid this filing fee, his motion is denied as moot.

### X.    Plaintiff's Filing Fees

Both the legislative history and the case law interpreting the Prison Litigation Reform Act (PLRA) instruct that unsuccessful prison litigants, like any other litigants, do not receive their filing fees back if their cases are dismissed. Even if his surviving claims are unsuccessful, Piekkola remains responsible for the balance of the $350.00 filing fee.

### CONCLUSION

Piekkola's complaint raises seven claims. Piekkola failed to state a claim of illegal incarceration, due process, access to the courts, and assistance of counsel. These claims are dismissed without prejudice pursuant to 28 U.S.C. § 1915A(b)(1). Illegal incarceration is the only claim Piekkola brought against defendants Jackley, Gortmaker, Slate, Smith, and Badure; they are therefore

22

dismissed without prejudice as parties defendant. Kaemingk and Dooley are named as defendants only in their supervisory capacities without further explanation of liability; they are therefore dismissed without prejudice. Piekkola's illegal search, privacy, right to associate, and defamation claims survive § 1915A screening.

Accordingly, it is ORDERED

1. Plaintiff's motion to extend the deadline to make an initial partial filing fee (Docket 8) is denied as moot.

2. Plaintiff's Claims 1, 5, and 6 are DISMISSED without prejudice pursuant to 28 U.S.C. § 1915A(b)(1).

3. Plaintiff's Claims 2, 3, 4, and 7 survive screening.

4. Defendants Dooley, Kaemingk, Jackley, Gortmaker, Slate, Smith, and Badure are DISMISSED without prejudice.

5. The United States Marshal shall serve a copy of the complaint (Docket 1), Summons, and this Order upon defendants Hunter Summers, Josh Klimek, Tammy Dejong, Travis Tjeerdsma, Kelly Tjeerdsma, Dustin Tjeerdsma, Lee Kauefenberg, Lyle Stock, and Steve Reynolds as directed by plaintiff. All costs of service shall be advanced by the United States.

6. Defendants will serve and file an answer or responsive pleading to the remaining claims in the complaint on or before 21 days following the date of service.

23

7. Piekkola will serve upon defendants, or, if appearance has been
   entered by counsel, upon their counsel, a copy of every further
   pleading or other document submitted for consideration by the court.
   He will include with the original paper to be filed with the clerk of
   court a certificate stating the date and that a true and correct copy of
   any document was mailed to defendants or their counsel.

Dated November 10, 2015.

BY THE COURT:

*/s/Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE