UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| MAX PIEKKOLA,<br><br>　　　　　　Plaintiff, and<br><br>KARRI REYNOLDS,<br><br>　　　　　　Plaintiff Intervenor,<br><br>　　vs.<br><br>**JOSH KLIMEK**, UNIT MANAGER AT THE MIKE DURFEE STATE PRISON (MDSP), SPRINGFIELD, SOUTH DAKOTA, IN HIS INDIVIDUAL AND OFFICIAL CAPACITIES; **TAMMY DEJONG**, UNIT COORDINATOR AT MDSP, IN HER INDIVIDUAL AND OFFICIAL CAPACITIES; **TRAVIS TJEERDSMA**, CASE MANAGER AT MDSP, IN HIS INDIVIDUAL AND OFFICIAL CAPACITIES; **KELLY TJEERDSMA**, CORPORAL AT MDSP, IN HER INDIVIDUAL AND OFFICIAL CAPACITIES; **DUSTIN TJEERDSMA**, CORRECTIONAL OFFICER AT MDSP, IN HIS INDIVIDUAL AND OFFICIAL CAPACITIES; **LEE KAUFENBERG**, SPECIAL SECURITY CAPTAIN AT THE MDSP, IN HIS INDIVIDUAL AND OFFICIAL CAPACITIES; **LYLE STOCK**, SERGEANT AT MDSP, IN HIS INDIVIDUAL AND OFFICIAL CAPACITIES; **STEVE REYNOLDS**, PREVIOUS EMPLOYEE OF MDSP WORKING AS THE SUPERVISOR OF THE AUTOMOTIVE PROGRAM, IN HIS INDIVIDUAL AND OFFICIAL CAPACITIES; AND **TAMMY DOYLE**, UNIT MANAGER AT MIKE DURFEE STATE PRISON, IN HER INDIVIDUAL AND OFFICIAL CAPACITIES;<br><br>　　　　　　Defendants. | 4:15-CV-04148-KES<br><br>REPORT AND RECOMMENDATION<br><br>[DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT DOCKET NOS. 44 & 69] |

**INTRODUCTION**

This matter is before the court on the *pro se* amended complaint of plaintiff Max Piekkola and intervenor Karri Reynolds.  See Docket No. 19. Mr. Piekkola and Ms. Reynolds allege defendants violated their constitutional rights and they request relief pursuant to 42 U.S.C. § 1983.  Id.  Mr. Piekkola also asserts a state-law claim of defamation.  Id.  Pending are defendants' motion for summary judgment and amended motion for summary judgment. Docket Nos. 44 & 69.  This case has been referred to this magistrate judge by the Honorable Karen E. Schreier, United States District Judge, for a recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B).  The following is this court's recommended disposition.

**FACTS**

**A.    Background**

Mr. Piekkola is a former Mike Durfee State Prison (MDSP) inmate.  He was paroled from MDSP and became romantically involved with Karri Reynolds. Ms. Reynolds was a South Dakota Department of Social Services (DSS) employee who had been assigned to the MDSP as a chemical dependency counselor.  Ms. Reynolds had been Mr. Piekkola's chemical dependency counselor while Mr. Piekkola was incarcerated at MDSP.  Pursuant to South Dakota Department of Corrections (DOC) policy, members of the DOC staff, including those working under contract assigned to the DOC, are prohibited from developing anything other than business relationships with inmates, or

2

from becoming emotionally, romantically, or sexually involved with inmates. Ms. Reynolds resigned her position from MDSP effective October 31, 2011.

Mr. Piekkola filed his complaint on September 21, 2015. Docket 1. Mr. Piekkola's complaint originally stated seven causes of action and named sixteen defendants. The district court screened the complaint and, on November 10, 2015, ordered that it be dismissed in part and served in part. Docket 9. Mr. Piekkola moved to amend his complaint which amendment was allowed by the district court. See Docket Nos. 12, 14, and 19. The court then screened the amended complaint and held four claims survived screening. See Docket No. 14. Those claims are described below.

In claim 3 of his amended complaint (Violation of Constitutional Right to Privacy), Mr. Piekkola alleges that when he returned to prison at the South Dakota State Penitentiary (SDSP) in 2012 on a parole violation, defendants accessed the personal information contained in his institutional files including drug/alcohol treatment records, medical records, and mental health records and disclosed such information without his consent. He further alleges defendant Kaufenberg accessed telephone calls Mr. Piekkola made to Karri Reynolds while Mr. Piekkola was incarcerated at the (SDSP) in 2012, and disclosed the calls to Karri's husband/ex-husband, defendant Steve Reynolds.

In claim 4 of his amended complaint (Violation of Constitutional Right to Association and Right to Liberty), Mr. Piekkola alleges the defendants unconstitutionally prevented him from communicating with Karri Reynolds after he was re-incarcerated at the MDSP on a parole violation in June, 2015.

The district court, while dismissing Mr. Piekkola's Fifth and Fourteenth Amendment claims, allowed his First Amendment claim as to his ability to communicate with Karri Reynolds.

In claim 6 of his amended complaint (Retaliation), Mr. Piekkola alleges the defendants retaliated against him for exercising his First, Fifth and Fourteenth Amendment rights. The district court found that though Mr. Piekkola he had no constitutionally recognized rights under the Fifth or Fourteenth Amendments that related to Karri, he had stated a claim as to a First Amendment right to communicate with her. Docket 14 at p. 18. As to this right, Mr. Piekkola asserts he engaged in protected activity (communication with Karri), that his communication with Karri was unconstitutionally restricted by the defendants, and that the restriction occurred because Mr. Piekkola tried to exercise his constitutional rights.

In claim 7 of his amended complaint (Defamation), Mr. Piekkola alleges the defendants defamed him and damaged his reputation by making false statements about him.

The district court's first and second screening orders eliminated several of the defendants Mr. Piekkola named in his original and amended complaints. Pursuant to the district court's November 10, 2015, and March 8, 2016, orders all but nine defendants were dismissed. The remaining defendants are: Josh Klimek, Tammy DeJong, Travis Tjeerdsma, Kelly Tjeerdsma, Dustin Tjeerdsma, Lee Kaufenberg, Lyle Stock, Tammy Doyle, and Steve Reynolds.

All defendants have now moved for summary judgment. Pursuant to Fed. R. Civ. P. 56(c)(1)(A) and Local Rule 56.1.(A), the defendants filed along with their motions for summary judgment (Docket 44 & 69) a statement of undisputed facts (Docket 46) which is supported by a two briefs (Docket Nos. 45 & 70) with attached exhibits and several affidavits.

The factual allegations contained in the statement of undisputed facts (Docket 46) are supported by the affidavits of Denny Kaemingk (Docket 47); Dustin Tjeerdsma (Docket 48); Gretchen Slate (Docket 49); Janet Waldron (Docket 50); Jason Piercy (Docket 51); Jennie Englund (Docket 52) Jennifer Rupp (Docket 53); Jennifer Stanwick (Docket 54); Josh Klimek (Docket 55); Kayla Tinker (Docket 56); Kelly Tjeerdsma (Docket 57); Kelsey Veurink (Docket 58); Lee Kaufenberg (Docket 59); Lyle Stock (Docket 60); Rebecca Schieffer (Docket 61); Robert Dooley (Docket 62); Steve Reynolds (Docket 63); Tammy DeJong (Docket 64), Tammy Doyle (Docket 65) and Travis Tjeerdsma (Docket 72).

In their affidavits, the various individuals referred to and provided foundation for the 55 exhibits which are attached to the defendants' original brief (Docket 45) in support of their summary judgment motion. Because of the large number of affidavits which support the defendants' motion, this opinion will refer to the affidavits by the affiant's name rather than the docket number.

After the defendants had moved for summary judgment and fully briefed the matter, Karri Reynolds moved to intervene as a party plaintiff. Docket 66.

The district court allowed Karri Reynolds to intervene, but in its order dated October 17, 2016, (Docket 68) the district court imposed a deadline (November 4, 2016) for the defendants to file an amended motion and brief in support of their already filed summary judgment pleadings, if they so desired, or to give notice if they did not so desire. The district court also imposed a deadline for Mr. Piekkola and Karri Reynolds to file any opposition to the defendants' summary judgment motions with supporting material (21 days after November 4, 2016 - November 25, 2016). Id.

Thereafter, the defendants timely filed their amended summary judgment motion and an amended brief (Docket Nos. 69 & 70). Though nine months have now elapsed since the filing of defendants' amended summary judgment motion, neither Mr. Piekkola nor plaintiff intervenor Karri Reynolds ever filed a response to the motions nor did either of them ever respond to the defendants' statement of undisputed facts as required by Local Rule 56.1.B. Because neither Mr. Piekkola nor Karri Reynolds responded to the defendants' statement of undisputed material facts, they are adopted by the court and are deemed admitted pursuant to Local Rule 56.1.D.[1] Finally, the court takes

---

[1] South Dakota Local Rule 56.1.D. states, "**D. Effect of Omission: Sanction.** All material facts set forth in the movant's statement of material facts will be deemed to be admitted unless controverted by the opposing party's statement of material facts."

That the court adopts the defendants' facts because neither Mr. Piekkola nor Karri Reynolds disputed them does not necessarily allow the court to summarily grant the defendants' motion. "Even if a motion for summary judgment on a particular claim stands unopposed, the district court must still determine that the moving party is entitled to judgment as a matter of law on

judicial notice of the Mike Durfee State Prison (MDSP) offender locator website, which indicates Mr. Piekkola has now been discharged from MDSP and has completed his prison sentence.[2]

**B.    Parties**

Plaintiff, Max Piekkola, was an inmate that was previously incarcerated at the Mike Durfee State Prison (MDSP) in Springfield, South Dakota. Defendants transferred Mr. Piekkola to the Rapid City Community Work Center (RCCWC) on approximately July 13, 2016. Dooley Affidavit ¶ 3; Schieffer Affidavit ¶ 3; Doyle Affidavit ¶ 2. The RCCWC is a DOC minimum custody facility located in Rapid City, South Dakota.  As noted by this court in the "Background" section, Mr. Piekkola has now been released from the custody of the DOC entirely and has completed his sentence.

Defendant, Josh Klimek is a Unit Manager at the MDSP in Springfield, South Dakota. Doc. 19, p. 4, ¶ 12. Mr. Klimek currently serves as the Unit Manager for the East Crawford and West Crawford Housing Units at the MDSP. Klimek Affidavit ¶ 1. He has held that position since October 24, 2014.

Defendant Tammy Doyle is also a Unit Manager at the MDSP. Doc. 19, p. 5, ¶ 19. Ms. Doyle has held that position since June 8, 2002. Doc. 29, p. 6, ¶ 20; Doyle Affidavit ¶ 1.

---

that claim." Interstate Power Co. v. Kansas City Power & Light Co., 992 F.2d 804, 807 (8th Cir. 1993).

[2] See https://doc.sd.gov/adult/lookup/details/?id=13526 (last checked August 15, 2017).

Defendant Tammy DeJong is a Unit Coordinator at the MDSP and currently serves as the Unit Coordinator for the West Crawford Housing Unit at MDSP. Doc. 19, p. 4, ¶ 13. She has served in that capacity since July 9, 2005. Doc. 29, p. 4, ¶ 14; DeJong Affidavit ¶ 1. DeJong was promoted on May 24, 2016, and now serves as a Case Manager at the MDSP. DeJong Affidavit ¶ 1.

Defendant Travis Tjeerdsma is a Case Manager at the MDSP and currently serves as the Case Manager for the West Crawford Housing Unit. Doc. 19, p. 4, ¶ 14. He has served in that position since May 9, 2012. Doc. 29, p. 5, ¶ 15; Travis Tjeerdsma Affidavit ¶ 1. Travis Tjeerdsma was promoted on May 9, 2016, to the position of a Production Manager at the MDSP.

Defendant Kelly Tjeerdsma is a Corporal at the MDSP in Springfield, South Dakota. Doc. 19, p. 5, ¶ 15. She has held that position since December 9, 2013. Doc. 29, p. 5, ¶16; Kelly Tjeerdsma Affidavit ¶1.

Defendant Dustin Tjeerdsma is also employed by the DOC and serves as a Correctional Officer at the MDSP in Springfield, South Dakota. Doc. 19, p. 5, ¶ 16; Doc. 29, p. 5, ¶ 17; Dustin Tjeerdsma Affidavit ¶1. He has served in that capacity since October 14, 2008.

Defendant Lee Kaufenberg serves as a Special Security Captain at the MDSP in Springfield, South Dakota and "conducts investigations into violations of DOC rules by inmates of the MDSP." Doc. 19, p. 5, ¶ 17; Doc. 29, p. 5, ¶ 18. He has served as a special Security Captain at the MDSP since November 9, 2014. Kaufenberg Affidavit ¶ 1.

Defendant Lyle Stock is a Sergeant at the MDSP in Springfield, South Dakota, and, at times, is assigned to "conduct disciplinary hearing officer (DHO) hearings as part of his employment." Doc. 19, p. 5, ¶ 18; Doc. 29, p. 5, ¶ 19. Defendant Stock has been employed by the MDSP since January 16, 1989. Stock Affidavit ¶ 1.

Defendant Steve Reynolds was a "previous employee of MDSP working as a supervisor of the automotive program." Doc. 19, p. 5, ¶ 20; Doc. 29, p. 6, ¶ 21. Steve Reynolds resigned from his position of employment at the MDSP on September 12, 2014. Reynolds Affidavit ¶ 1; Dooley Affidavit ¶ 9; Kaemingk Affidavit ¶ 20.

**C.     Claim 3:  Violation of Constitutional Right to Privacy**

Defendants Lee Kaufenberg, Travis Tjeerdsma, Kelly Tjeerdsma, Dustin Tjeerdsma, and Steve Reynolds, did not, due to their employment, have access to Mr. Piekkola's personal information, including but not limited to alcohol/drug treatment records, medical information and mental health records. Kaufenberg Affidavit ¶ 12; Reynolds Affidavit ¶ 16-17; Travis Tjeerdsma Affidavit ¶ 7; Dustin Tjeerdsma Affidavit ¶ 12; Kelly Tjeerdsma Affidavit ¶ 7.

South Dakota Department of Health (SDDOH) Policy P-H-02, Confidentiality of Health Records, expressly provides that "the South Dakota Department of Health Correctional Health Care Policy requires that all medical records be kept confidential and separate from DOC records." Tinker Affidavit ¶ 3; Doc. 45-19.

SDDOH policy P-H-02 further provides, "all medical records are to be secured at all times and accessible only to authorized personal." Tinker Affidavit ¶ 2; Doc. 45-19. Pursuant to the policy, "[t]he clinical supervisor and/or designee will control access to the medical records . . . Any information requested must have prior approval of the clinical supervisor or designee." Tinker Affidavit ¶ 4; Doc. 45-19.

In order for the clinical supervisor to approve/authorize the release of any medical information, there must first be a showing, by the individual requesting access to such records, why the release of those records is necessary. Tinker Affidavit ¶ 5.

Following his release from the MDSP in October, 2011, and parole to the Community Transition Program (CTP) in Sioux Falls, South Dakota, the defendants' access to Mr. Piekkola's medical file was even further restricted. In that regard, SDDOH policy P-H-02 provides that "if an inmate transfers to another SDDOC institution, the previous medical record can be requested." Tinker Affidavit ¶ 6; Doc. 45-19. Pursuant to policy, "records that are transported by non-health staff will be sealed." Tinker Affidavit ¶ 6.

Pursuant to SDDOH policy P-H-03, Management of Health Records, steps are further taken to preserve/maintain the confidentiality of an inmate's records even after he/she is paroled or discharged. As provided by that policy, "if the inmate has a paper chart when he/she is discharged, the medical record will remain at the facility in the archives for a period of ten (10) years." Tinker Affidavit ¶ 7; Doc. 45-54.

SDDOH P-H-03, requires that "the medical records shall be protected from unauthorized access by placement in storage." Doc. 45-54. As expressly stated therein, "information in all medical records remains confidential." Tinker Affidavit ¶ 7; Doc. 45-54.

As of April, 2015, arrangements were made whereby an inmate's medical records are now stored electronically rather that in paper format. Tinker Affidavit ¶ 9. Any paper files prior to April, 2015, are, pursuant to SDDOH Policy P-H-03, kept in the archives for a period of ten (10) years following the inmates release/discharge. Those files are placed/kept in storage where they are protected from unauthorized access. Tinker Affidavit ¶ 9; Doc. 45-54.

Following the implementation of EMR (Electronic Medical Record) via CorrecTek by the SDDOH in April, 2015, the only individuals allowed access to an inmate's medical file stored electronically are those specifically identified in the system as medical/mental health professionals. Tinker Affidavit ¶ 9. Correctional Officers, therefore, do not have access to any of the information contained in the EMR. Tinker Affidavit ¶ 9.

The same is also true for any information stored in inmate Piekkola's behavioral health or alcohol/drug treatment records. Once again, every effort is made to ensure the confidentially of said records at all times. Englund Affidavit ¶ 2.

An inmate's behavioral health records are, at all times, kept separate from his/her correctional records. Englund Affidavit ¶ 2. With the exception of the initial diagnosis and the need for referral for service, at no time whatsoever, will

11

information contained in an inmate's behavioral health or alcohol/drug treatment records be incorporated with their DOC file. Englund Affidavit ¶ 2.

In an inmate's alcohol/drug treatment records, all notes pertaining to chemical dependency are maintained in the offender's file which was kept in a locked/secured area at the MDSP which can only be accessed by the Clinical Supervisor. Englund Affidavit ¶ 6.  A correctional officer, without the express authorization from the Clinical Supervisor, would not have had access to an inmate's alcohol/drug treatment records. Englund Affidavit ¶ 6.

The information contained within an inmate's behavioral health and/or alcohol/drug treatment records is deemed confidential.  South Dakota Department of Social Services (SDDSS) Policy 200.05, expressly states that SDDSS staff will share information contained in an inmate's behavioral health records with staff/employees of the SDDOC only when deemed necessary to secure/maintain the safety and security of the institution as well the safety of the inmates and staff. Englund Affidavit ¶ 2.

In order to ensure/preserve the confidentiality of an inmate's behavioral health records, the SDDSS has entered into a Memorandum of Understanding (MOU) with the DOC and SDDOH. The MOU states the DOC "acknowledges that receiving, storing, processing or otherwise dealing with information from the Correctional Behavioral Health Substance Abuse Program about the patients in the program, it is fully bound by the provisions of the Federal Regulations governing the confidentially of alcohol and drug abuse patient records, 42 CFR Part II and any applicable South Dakota codified law." Englund Affidavit ¶ 3.

The MOU further provides that the DOC "will contact the site's Correctional Behavioral Health Clinical Supervisor prior to release of any mental health or chemical dependency records." Englund Affidavit ¶ 4. The Correctional Behavioral Health Clinical Supervisor will then "assist the DOC in processing requests for mental health and/or chemical dependency records." Id. The MOU further provides "the Clinical Supervisor will provide guidance to the DOC regarding the release of the records to assist in maintaining the confidentiality of the records." Englund Affidavit ¶ 4.

Since on or about March, 2013, arrangements have been made to store inmate's behavioral health records electronically. Englund Affidavit ¶ 7. That is the date when the DOC implemented the Comprehensive Offender Management System (COMS). Id. When implementing COMS, steps were again taken to ensure/maintain the confidentiality of an inmate's behavioral health records and to limit/restrict the number of individuals having access to them. Englund Affidavit ¶ 7. Pursuant to COMS, the only individuals allowed access to an inmate's behavioral health record are those specifically identified in the system as medical/mental health professionals. Englund Affidavit ¶ 7.

Correctional officers do not have access to any of the information contained in an inmate's behavioral health and /or alcohol/chemical dependency records. Englund Affidavit ¶ 7-8. At no time, therefore, did defendants "access the personal medical information of Mr. Piekkola" and disclose it without his consent. Kelly Tjeerdsma Affidavit ¶¶ 11, 15; Travis Tjeerdsma Affidavit ¶¶ 13-16; Dustin Tjeerdsma Affidavit ¶¶ 11, 15; Kaufenberg Affidavit ¶ 15; Reynolds Affidavit ¶ 17. It would have been impossible for defendants to have disclosed such "personal

information in Mr. Piekkola's alcohol/drug treatment records, medical information and mental health information" since they simply did not have access to the information in question. Travis Tjeerdsma Affidavit ¶¶ 13-16; Kelly Tjeerdsma Affidavit ¶ 15; Dustin Tjeerdsma Affidavit ¶ 15; Kaufenberg Affidavit ¶¶ 11-12, 15; Reynolds Affidavit ¶ 17.

Additionally, following his release on parole in October 2011, Mr. Piekkola's institutional file would no longer have been kept/maintained at the MDSP. Defendants, therefore, did not have access to the information contained in Piekkola's institutional file at the time in question. Travis Tjeerdsma Affidavit ¶ 12; Kelly Tjeerdsma Affidavit ¶ 7; Dustin Tjeerdsma Affidavit ¶ 7; Kaufenberg Affidavit ¶ 6, 15; Reynolds Affidavit ¶ 16.

DOC Policy 1.4.B.4, Inmate Transfers between Facilities, expressly provides that "[a]ny institutional file that may exist for the transferring inmate(s) is forwarded to the receiving facility." Travis Tjeerdsma Affidavit ¶ 9; Kelly Tjeerdsma Affidavit ¶ 8; Dustin Tjeerdsma Affidavit ¶ 8; Kaufenberg Affidavit ¶ 7; Doc. 45-22. As provided for in the version of DOC Policy 1.4.B.4 in effect at the time of Mr. Piekkola's release to the Community Transition Program (CTP) "for inmates transferring to a unit at a different facility/complex, institutional files will be forwarded to a central pick up point where they will be packaged in a container(s)." Kelly Tjeerdsma Affidavit ¶ 8; Dustin Tjeerdsma Affidavit ¶ 8; Travis Tjeerdsma Affidavit ¶ 9; Kaufenberg Affidavit ¶ 7; Doc.45-24.

In the case of an inmate who is released on parole, DOC Policy 1.1.E.1, Adult Offender Case Records Content and Management, provides that "Offender institutional files will be forwarded to the offender's unit team or parole agent at

the time of the transfer to or from a DOC facility, unit or to or from parole supervision." Kelly Tjeerdsma Affidavit ¶ 9; Dustin Tjeerdsma Affidavit ¶ 9; Travis Tjeerdsma Affidavit ¶ 10; Kaufenberg Affidavit ¶ 8; Doc. 45-23.

It would therefore have been impossible for the named defendants to have accessed Mr. Piekkola's institutional file following his release on parole in October, 2011. Dustin Tjeerdsma Affidavit ¶ 11; Kelly Tjeerdsma Affidavit ¶ 11; Travis Tjeerdsma Affidavit ¶ 12; Kaufenberg Affidavit ¶ 11. Mr. Piekkola's institutional file, pursuant to DOC policies 1.1.E.1 and 1.4.B.4, would have been sent to Mr. Piekkola's parole agent and would no longer have been kept/maintained at the MDSP. Kelly Tjeerdsma Affidavit ¶ 11; Dustin Tjeerdsma Affidavit ¶ 11; Travis Tjeerdsma Affidavit ¶ 12; Kaufenberg Affidavit ¶ 11.

Defendant Kaufenberg, therefore, did not nor could not "allow defendant Reynolds to have access to Mr. Piekkola's institutional file." Kaufenberg Affidavit ¶ 6. This is because defendant Kaufenberg did not have access to Mr. Piekkola's institutional file at the time in question. Kaufenberg Affidavit ¶ 6.

Defendant Kaufenberg also did not allow defendant Reynolds access to the recorded calls that Mr. Piekkola allegedly made to Karri Reynolds while Mr. Piekkola was housed at the SDSP in Sioux Falls, South Dakota, following the revocation of his parole in April, 2012. Kaufenberg Affidavit ¶ 3, 16-19. Captain Kaufenberg, as the "Special Security Captain at the MDSP," was simply not aware of any telephone calls that Mr. Piekkola may have made to Karri Reynolds while Mr. Piekkola was at SDSP. Kaufenberg Affidavit ¶ 17.

Any recording of telephone calls made by an inmate while at the SDSP in Sioux Falls, South Dakota, would have been kept/maintained at that facility.

Kaufenberg Affidavit ¶ 18. As such, Captain Kaufenberg would not have had ready access to such calls. Kaufenberg Affidavit ¶ 18.  Captain Kaufenberg had no reason whatsoever, as "Special Security Captain at the MDSP," to monitor the telephone calls supposedly made by Mr. Piekkola while at the SDSP. Kaufenberg Affidavit ¶ 19. Captain Kaufenberg, by Mr. Piekkola's own admissions, is only responsible for "investigating violations of DOC rules by inmates at the MDSP." Doc. 19, p. 5, ¶ 17; Kaufenberg Affidavit ¶ 19. Captain Kaufenberg has no involvement with the investigation of rule infractions committed by inmates housed at the SDSP. Kaufenberg Affidavit ¶ 19.

Although Mr. Piekkola claims defendants "during this same time frame (2011-2012) sent derogatory, harassing and threatening messages to Mr. Piekkola and Karri Reynolds, neither Mr. Piekkola nor Karri Reynolds ever mentioned anything whatsoever to Mr. Piekkola's parole agents about any such alleged messages. Rupp Affidavit ¶ 26; Veurink Affidavit ¶ 8. While Mr. Piekkola alleges the messages were sent by defendants in 2011-2012, he waited until August 2015 before mentioning them to anyone. Kaemingk Affidavit ¶¶ 3-4; Doc. 45-47 (letter dated August 13, 2015, from Mr. Piekkola to Dennis Kaemingk).  In response to these allegations, Secretary Kaemingk wrote to Mr. Piekkola on September 3, 2015, and noted that Mr. Piekkola "did not mention to your parole agent or Mr. Clark that you have been contacted by staff during your time on parole." Kaemingk Affidavit ¶ 7; Doc. 45-48.

Mr. Piekkola, in his subsequent letter to Secretary Kaemingk dated September 9, 2015, did not deny that he had failed to inform his parole agent or Director Clark of these alleged "harassing, threatening and liable/slanderous

16

messages to Karri and me." Kaemingk Affidavit ¶ 8; Doc. 45-49. According to

Mr. Piekkola, the letter from Secretary Kaemingk was "a prime example of why I

didn't inform my parole agent or Director Clark." Kaemingk Affidavit ¶ 8, Doc. 45-

49.

### D.  Claim 4:  Violation of Constitutional Right to Associate/Communicate

Although Mr. Piekkola alleges defendants Klimek, DeJong, Travis

Tjeerdsma, Doyle and Stock "violated his constitutional right to associate and

right to liberty (1st, 5th and 14th Amendments) as a result of his having been

prohibited from any association with Karri Reynolds," the district court, in its

order dated March 8, 2016, specifically found Mr. Piekkola "has no

constitutionally recognized right to be in a relationship with Karri." Doc. 14,

p. 21. According to the district court, Mr. Piekkola "also has no constitutionally

recognized rights under the 5th or 14th Amendment that relate to her." Id.

The decision in this case to restrict/limit Mr. Piekkola's ability to contact

Karri Reynolds by telephone was based on DOC policy 1.5.D.4, Inmate Access

to Telephones. Dooley Affidavit ¶ 25; Kaemingk Affidavit ¶ 34. As expressly

stated in that policy, "Inmate access to telephones is subject to limitations and

conditions which the warden determines are necessary to ensure the security

and good order of the institution and/or to protect the public." Kaemingk

Affidavit ¶ 34; Dooley Affidavit ¶ 25; Doc. 45-43.

DOC policy 1.5.D.4 further provides "State of South Dakota or

contractual employees terminated from employment with the DOC for

inappropriate activity/relations with an inmate, and those who have resigned

to avoid termination for inappropriate activity/relations with an inmate, may not be included in an inmate's calling list without the approval of the warden." Dooley Affidavit ¶ 26; Kaemingk Affidavit ¶ 35; Doc. 45-43.

Similar restrictions were in place in June, 2015, when Mr. Piekkola returned to the MDSP. Dooley Affidavit ¶ 27; Kaemingk Affidavit ¶ 36; Doc. 45-44. As provided in the version of DOC policy 1.5.D.4 in effect at the time, "State of South Dakota or contractual employees terminated from employment with the state or who have resigned to avoid termination due to inappropriate activity/ relations with an inmate, may not be on an inmate calling list." Dooley Affidavit ¶ 27; Kaemingk Affidavit ¶ 36; Doc. 45-44.

Officials in this case had reason to believe that Karri Reynolds resigned from her position as a chemical dependency counselor at the MDSP in order to avoid termination for inappropriate activity/relations with an inmate, Mr. Piekkola. Dooley Affidavit ¶ 28; Kaemingk Affidavit ¶ 32.

Mr. Piekkola was granted parole on or about October 18, 2011. He was thereafter released to the Community Transition Program (CTP) in Sioux Falls, South Dakota. Dooley Affidavit ¶ 5; Kaemingk Affidavit ¶ 16. It was shortly thereafter, on October 31, 2011, that Karri Reynolds resigned from her position as a treatment counselor at the MDSP. Dooley Affidavit ¶ 6; Kaemingk Affidavit ¶ 17. In a letter to Cory Nelson, Clinical Supervisor, Correctional Behavioral Health, dated October 31, 2011, Karri Reynolds indicated that the letter was to serve as "formal notification that I am leaving my position as a chemical dependency

counselor at the Mike Durfee State Prison with the State of South Dakota on October 31, 2011." Dooley Affidavit ¶ 6; Kaemingk Affidavit ¶ 17; Doc. 45-50.

Information was thereafter received/obtained by officials at the MDSP regarding a possible sexual relationship that may have existed between Mr. Piekkola and Karri Reynolds. Dooley Affidavit ¶ 7; Kaemingk Affidavit ¶ 18. Pursuant to SD policy 1.1.C.1 Code of Ethics, staff members are clearly "prohibited from developing inappropriate relationships with offenders other than those necessary in the normal course of business." Kaemingk Affidavit ¶ 14; Docs. 45-45 and 45-46.

DOC policy 1.1.C.1 further expressly states that staff members are "prohibited from developing inappropriate relationships with inmates." Dooley Affidavit ¶ 21; Kaemingk Affidavit ¶ 32; Docs. 45-45 and 45-46. Pursuant to this policy, "a staff member may not become emotionally, romantically, financially or sexually involved with any offender." Id.

As defined in DOC policy 1.1.C.1, a staff member includes "any person employed by the DOC, full or part time, including an individual under contract assigned to the DOC, an employee of another state agency assigned to the DOC, authorized volunteers and student interns." Dooley Affidavit ¶ 23; Kaemingk Affidavit ¶ 13; Doc. 45-46.  That same definition can be found in the DOC policy which was in effect in October 2011 at the time Karri Reynolds resigned from her position as a chemical dependency counselor at the MDSP. Dooley Affidavit ¶ 23; Kaemingk Affidavit ¶ 13; Doc. 45-45.

Based on the information which had been obtained regarding the possible relationship between Mr. Piekkola and Karri Reynolds, staff at the MDSP contacted the South Dakota Division of Criminal Investigation (DCI) and asked for their assistance in investigating these allegations. Dooley Affidavit ¶ 10; Kaemingk Affidavit ¶ 21.

Karri Reynolds, as part of that investigation, was requested and voluntarily agreed to undergo a polygraph examination regarding her relationship with Mr. Piekkola. Doc. 19, p.7, ¶ 29; Dooley Affidavit ¶ 11; Kaemingk Affidavit ¶ 22. DCI found no basis for criminal charges against Karri Reynolds, but information was obtained that refuted Mr. Piekkola's claim that Karri Reynolds did not resign in order to "avoid being fired for inappropriate contact with inmates." Dooley Affidavit¶ 11; Kaemingk Affidavit ¶ 22.

Officials with the DOC were provided with a copy of the investigative report prepared by Gretchen Slate, a Special Agent with the DCI. Dooley Affidavit ¶ 12; Kaemingk Affidavit ¶ 23. Although Karri Reynolds denied, during her interview with Ms. Slate, that she ever "had sex or touched Max while inside the MDSP," she did confirm that, after Mr. Piekkola was placed in the CTP in Sioux Falls, South Dakota, she made various trips to Sioux Falls on weekends to see him. Slate Affidavit ¶ 11; Dooley Affidavit ¶ 15; Kaemingk Affidavit ¶ 26.[3] A

---

[3] The affidavits of DCI Agent Gretchen Slate, Denny Kaemingk and Robert Dooley all make reference to statements Karri Reynolds made during her interview with Gretchen Slate. Defendants Kaemingk and Dooley indicate in their affidavits that they have been provided with and relied upon the information within DCI Agent Slate's official report regarding the investigation of a possible sexual relationship between Karri Reynolds and Inmate Piekkola. Kaemingk Affidavit ¶ 23; Dooley Affidavit ¶ 12. Agent Slate did not attach a

number of those trips occurred prior to Karri Reynolds' resignation on October 31, 2011.  During her interview with Ms. Slate, Karri Reynolds was also questioned regarding  several text messages between her and the Mr. Piekkola. In one text message Karri Reynolds indicated to Mr. Piekkola "I love u." Slate Affidavit ¶12; Dooley Affidavit ¶16; Kaemingk Affidavit ¶27.

It was also been discovered during the course of the investigation that Karri Reynolds had a second cell phone that she used to communicate with Mr. Piekkola.  Slate Affidavit ¶ 9. When confronted with the above text message, Karri Reynolds "confirmed that she has a vested emotional interest in Max but she is also not an idiot." Slate Affidavit ¶12; Dooley Affidavit ¶ 16; Kaemingk Affidavit ¶ 27.

During the polygraph examination referred to by Mr. Piekkola in his amended complaint, Karri Reynolds, while denying that any sexual contact occurred while Mr. Piekkola was still physically in the confines of the MDSP, she did not deny that she engaged in sexual relations with Mr. Piekkola after he was transferred to CTP. Piercy Affidavit ¶¶ 7-8; Dooley Affidavit ¶ 17 Kaemingk Affidavit ¶ 28; Slate Affidavit ¶ 16.  During the pre-examination portion of the polygraph test, Karri Reynolds told the polygraph examiner that

---

copy of her report to her Affidavit, but indicated she would produce a copy for in camera inspection by the court if necessary.  Slate Affidavit ¶ 19.  The statements attributed to Karri Reynolds during the course of Agent Slate's DCI investigation are not hearsay and are admissible in this summary judgment proceeding.  As to Karri's statements to Agent Slate, they are statements offered against Karri, who is an opposing party, and were made by Karri.  <u>See</u> FED. R. EVID. 801(d)(2)(A).  As to Agent Slate's report recounting Karri's statement, that is a record of a regularly-conducted activity of the DCI.  <u>See</u> FED. R. EVID. 803(6)(B).

"since the time inmate Piekkola was transferred to CTP in Sioux Falls" (October 18, 2011), she had begun a sexual relationship with him. Piercy Affidavit ¶ 7; Dooley Affidavit ¶18; Kaemingk Affidavit ¶29; Slate Affidavit ¶¶ 16-17.

When asked if she could be more specific regarding the post-transfer sexual relationship with Mr. Piekkola, Karri Reynolds refused to cooperate. Piercy Affidavit ¶ 9; Dooley Affidavit ¶ 18; Kaemingk Affidavit ¶ 29. She told the examiner that such information was not germane because they were only there to test whether or not she had sex with him while he was still physically in the penitentiary.  Piercy Affidavit ¶ 9.

The information obtained as a result of the investigation conducted by the DCI also included Karri's statement that "she decided to leave on October 31, 2011, because after Max left for the CTP in Sioux Falls, another inmate approached her asking that she bring items into the prison." Slate Affidavit ¶ 13; Dooley Affidavit ¶ 12; Kaemingk Affidavit ¶ 23.  According to the statement Karri Reynolds made to Agent Slate, the other inmate threatened her that "if she did not comply, he would turn her in for talking to Max." Slate Affidavit ¶ 13; Dooley Affidavit ¶ 12; Kaemingk Affidavit  ¶ 24. Karri Reynolds, during her interview with Agent Slate, "confirmed that the other inmate knew that she and Max were talking about getting together." Slate Affidavit ¶ 13; Dooley Affidavit ¶ 13; Kaemingk Affidavit ¶ 24.

Karri Reynolds informed Agent Slate  "the only reason she quit was because she knew that she could not report it [threats by other inmate] as she would have been fired anyway because of her verbal communication with Max."

Slate Affidavit ¶ 13; Dooley Affidavit ¶ 14; Kaemingk Affidavit ¶ 25. The information obtained during the course of the investigation provided officials at the MDSP with more than sufficient reason to believe that Karri Reynolds was in clear violation of DOC policy 1.1.C.1 which expressly prohibits staff members from "developing relationships with offenders other than those necessary in the normal course of business." Dooley Affidavit ¶ 32; Kaemingk Affidavit ¶ 41.

Officials at the MDSP, therefore, also had ample reason to believe that Karri Reynolds, did, in fact, resign from her position as a chemical dependency counselor at the MDSP in order to "avoid being fired for inappropriate contact with inmates." Dooley Affidavit ¶ 21; Kaemingk Affidavit ¶ 32. Karri Reynolds had, based on the information available to officials at the MDSP, demonstrated her inability to comply with clearly established policy in place at said institution. Dooley Affidavit ¶ 33; Kaemingk Affidavit ¶ 42. In light of her apparent willingness to violate established policy, officials had reason to believe that, if allowed to communicate with Mr. Piekkola by telephone, Karri Reynolds might attempt to pass on her knowledge of security procedures in place at the MDSP in an attempt to assist in planning an escape or otherwise circumvent DOC policy. Dooley Affidavit ¶ 33; Kaemingk Affidavit ¶ 42.

These concerns/fears were heightened as a result of the willingness demonstrated by Karri Reynolds to violate clearly established policy prohibiting a staff member from becoming emotionally or romantically involved with an inmate. Dooley Affidavit ¶ 32; Kaemingk Affidavit ¶ 41. Karri Reynolds, following her resignation as a chemical dependency counselor, was thus considered by officials to present a risk to the good order and security of the MDSP. Dooley

Affidavit ¶ 29; Kaemingk Affidavit ¶ 38. Those concerns were based, in part, on her knowledge of the various security procedures in place at the MDSP. Id.

Officials deemed Karri Reynolds a security risk based on her intimate knowledge regarding the internal operations of the MDSP. Dooley Affidavit ¶ 29; Kaemingk Affidavit ¶38; Stanwick-Klimek ¶ 6. Prior to her employment as a chemical dependency counselor at the MDSP, Karri Reynolds was required to undergo specific training regarding the various security procedures in place at the MDSP. Dooley Affidavit ¶ 30; Kaemingk Affidavit ¶ 39; Stanwick-Klimek Affidavit ¶3. The topics addressed during her "pre-service training" included basic principles of security such as inmate movement, transportation of inmates, security inspections, control of keys and tools within the MDSP as well as the various security equipment in place at said facility. Dooley Affidavit ¶ 30; Kaemingk Affidavit ¶ 39; Stanwick-Klimek Affidavit ¶3. In addition, Karri Reynolds certified, on various occasions, that she had been provided with, read, understood and agreed to abide by Operation Memorandums (OM's) in place at the MDSP which dealt with various security issues. Stanwick-Klimek Affidavit ¶ 4. Karri Reynolds certified that she had not only read said OM's but was also "given the opportunity to ask questions of my supervisor and have received answers/clarification to those questions concerning these OM's." Stanwick-Klimek Affidavit ¶ 5. Based on her training and knowledge, as well as her admitted relationship with Mr. Piekkola, Karri Reynolds was considered an obvious security risk following her resignation. Dooley Affidavit ¶ 31; Kaemingk Affidavit ¶ 40; Stanwick-Klimek Affidavit ¶ 6.

The defendants deny their actions "had a negative impact on the relationship between Piekkola and Reynolds" and "made marriage impossible," as claimed by Mr. Piekkola. The record shows the Piekkola/Reynolds relationship had serious problems that had nothing whatsoever to do with defendants. Veurink Affidavit ¶ 6; Rupp Affidavit ¶ 3, 5-6, 8-9, 11-12, 19, 23; Doc. 45-35 through 45-42.[4]

Mr. Piekkola's parole agent, Kelsey Veurink, received a telephone call from Karri Reynolds on or about September 29, 2014, "advising me that he [Plaintiff] is manic and she's going to have to get a protective order in place if I don't detain him." Veurink Affidavit ¶ 6; Doc. 45-35. Karri Reynolds told Agent Veurink that Plaintiff was "not going to work and was threatening her constantly."

A review of the Case Notes Summary prepared by Agent Veurink reveals that Karri Reynolds was "crying the whole time, stating this isn't him and he needs help." Veurink Affidavit ¶ 6; Doc. 45-35. The record further reflects that Mr. Piekkola was later allowed, in October, 2014, to relocate to the area near Belle Fourche, South Dakota, "due to issues he was having with his girlfriend, Karri Reynolds." Rupp Affidavit ¶ 3.

---

[4] The statements attributed to Karri Reynolds and/or Mr. Piekkola via Parole Agents Rupp or Veurink are also admissible in this summary judgment proceeding. The statements are all taken from Agent Rupp and Agent Veurink's regularly kept case notes (Doc. 45-35 through 45-42 and Doc. 45-51 through Doc. 45-53), and are thus exceptions to the hearsay rule under FED. R. EVID. 803(6). See e.g. United States v. Hall, 419 F.3d 980, 987 (9th Cir. 2005) ("the medical records from [the defendant's] hospital visit and the notes of [the defendant's] parole officer were records kept in the ordinary course of business, classic exceptions to the hearsay rule. FED. R. EVID. 803(6).").

Shortly thereafter, on or about October 22, 2014, Mr. Piekkola's new parole agent, Jennifer Rupp, received a telephone call from "Max's ex-girlfriend that lives in Sioux Falls, South Dakota." Rupp Affidavit ¶ 4; Doc. 45-35. Karri Reynolds told Agent Rupp that Mr. Piekkola was "behind on his payments for the motorcycle" and that since "it is in her name she received a repo letter." Karri Reynolds informed Agent Rupp that she "can't have anyone come get the bike because he [Mr. Piekkola] has threatened to beat anyone up that tries to get it." Rupp Affidavit ¶ 4; Exhibit 35.  Karri Reynolds also informed Agent Rupp that Mr. Piekkola had been "harassing her by calling and texting all the time." Rupp Affidavit ¶ 5; Doc. 45-35. According to Karri Reynolds, she had "tried to help him [Mr. Piekkola] but she is done." Karri Reynolds also told Agent Rupp that "there are pictures of Max at the bar on Facebook and that he isn't getting any better." Rupp Affidavit ¶ 5; Doc. 45-35. Karri Reynolds was adamant that she "wants nothing to do with him anymore."

Agent Rupp thereafter contacted Mr. Piekkola, on October 22, 2014, in regards to the telephone call she had received from Karri Reynolds. In response, Mr. Piekkola told Agent Rupp that Karri Reynolds was "trying to get him into trouble." Rupp Affidavit ¶ 6; Doc. 45-36. Mr. Piekkola indicated, during the call with Agent Rupp that he "wants to be done with her completely." Id.

Mr. Piekkola later told Agent Rupp, on or about November 6, 2014, that "the bank was taking the bike because insurance considered it totaled when he hit a deer." Rupp Affidavit ¶ 8; Doc. 45-36. While talking with Agent Rupp,

Mr. Piekkola stated he was "just glad that he doesn't have to deal with his ex anymore." Subsequently, Agent Rupp received a telephone call from Mr. Piekkola on January 24, 2015, indicating "his ex is still trying to get him into trouble." Rupp Affidavit ¶ 9; Doc. 45-37. Mr. Piekkola told Agent Rupp Karri Reynolds was "threatening him saying that she is going to the police and tell them that he hit her." Id. In response, Agent Rupp advised Mr. Piekkola that he "should go talk to the police about getting a restraining order on her." Rupp Affidavit ¶ 9. Agent Rupp, however, later received a telephone call from Mr. Piekkola on March 5, 2015, "wanting to ask about his ex-girlfriend from Sioux Falls moving in with him." Rupp Affidavit ¶ 10. Agent Rupp informed Plaintiff that "the first time she calls the cops on him or calls me to complain, she will be moving out because their past hasn't been the best." Id.

It was shortly thereafter, on or about March 11, 2015, that Agent Rupp received another telephone call from Mr. Piekkola. They "discussed Karri calling the police twice on him in the past week." Rupp Affidavit ¶ 11; Doc. 45-37. Mr. Piekkola admitted during the call that he was "realizing that moving in with her was not the best idea." Id.

Agent Rupp, on or about March 13, 2015, spoke with Karri Reynolds who stated that she was "scared of Max" and had gone to the Artemis House (local women's shelter) to stay. Rupp Affidavit ¶ 12; Doc. 45-39. Karri Reynolds indicated she "didn't want to get Max into trouble." She "just wanted to leave him." Id. Karri Reynolds specifically told Agent Rupp she "did not want me [Agent Rupp] to tell Max that she told me any of this because she was scared of the

consequences." Rupp Affidavit ¶ 12; Doc. 45-39. Agent Rupp thereafter spoke with her supervisor regarding the telephone call from Karri Reynolds and was told to "do a welfare check on Max." Rupp Affidavit ¶ 13; Doc. 45-38. Agent Rupp thereafter "asked [Mr. Piekkola] about his relationship with Karri since she told me he has been physical with her." Id.

Agent Rupp, "after leaving Max," again "spoke with Karri about everything." Rupp Affidavit ¶ 14; Doc. 45-38. Once again, Karri Reynolds told Agent Rupp that she was "scared of Max." According to Karri Reynolds, Plaintiff "had naked pictures of her on his phone and threatened to put them on the internet." Id.

Based on the statements made by Karri Reynolds, Agent Rupp "went back to speak with Max" and "asked for his phone and told him that I was taking it for the weekend." Rupp Affidavit ¶ 15; Doc. 45-38. Agent Rupp later received yet another telephone call from Karri Reynolds "stating that she wanted Max's phone or she was going to call the cops because it is hers." Rupp Affidavit ¶ 17; Doc. 45-39. In response to this phone call, Agent Rupp attempted to explain to Karri Reynolds that she was "trying to help her out but if she chooses to stay with him [Mr. Piekkola] and not take the opportunity to leave then I cannot do anything about that." Rupp Affidavit ¶ 17; Doc. 45-39.

On or about March 27, 2015, Agent Rupp received a telephone call from the Chief of Police for the Belle Fourche Police Department asking about Mr. Piekkola's whereabouts. Agent Rupp was advised that Mr. Piekkola's "girlfriend was in the police department and they are going to charge him with

Aggravated Assault due to visible marks around her neck." Rupp Affidavit ¶ 19; Doc. 45-40. Karri Reynolds had told police that "Max strangled her." After speaking with the Chief of Police, Agent Rupp contacted Mr. Piekkola and informed him that the local authorities had attempted to reach him. Rupp Affidavit ¶ 20; Doc. 45-40. Mr. Piekkola was directed to "go to the police department ASAP." Id.

Although assuring Agent Rupp that he would go to the police station, Mr. Piekkola failed to do so. Agent Rupp, approximately three (3) hours later, received another telephone call from the local authorities indicating that "Max had not come in yet." Rupp Affidavit ¶ 21. "An ATL [attempt to locate] was thus sent out to all surrounding law enforcement agencies." Id.

Agent Rupp, several days later, "received a phone call from Max from an unknown number." Rupp Affidavit ¶ 22; Doc. 45-41. They "discussed the current situation," and Agent Rupp asked him "why he didn't go speak with Belle PD." Id. In response to her questions, Mr. Piekkola told Agent Rupp that he "talked to Karri the last couple of days." According to Mr. Piekkola, Karri Reynolds "told him that Belle PD pressured her into saying certain things." Rupp Affidavit ¶ 22; Doc. 45-41. Several days went by and, on April 10, 2015, local authorities still had "no new updates on Mr. Piekkola's whereabouts or activities." Rupp Affidavit ¶ 23.

It was Karri Reynolds who eventually informed authorities of Mr. Piekkola's whereabouts. She contacted local authorities on or about April 20, 2015, and informed them that Mr. Piekkola "went to Arizona to live with his

uncle." Rupp Affidavit ¶ 23; Doc. 45-40. Agent Rupp, on or about April 27, 2015, received a telephone call from local authorities indicating that they "got the information and address of where Max is staying." Rupp Affidavit ¶ 24; Doc. 45-40. According to the Chief of Police, they'd received "information that he [Mr. Piekkola] has a firearm and that he has been using meth heavily so they are being very cautious." Id.

**E.     Claim 6:  Retaliation**

Mr. Piekkola was, as indicated in his amended complaint, "returned to SDSP in June, 2015, to face charges that he violated his conditional release by absconding from parole supervision." Doc. 19, p. 7, ¶ 42. Once June 15, 2015, Mr. Piekkola was returned to the MDSP. Id. ¶ 45.

Mr. Piekkola was not placed in administrative segregation in retaliation for utilizing the administrative remedy process.   Mr. Piekkola did, on or about July 7, 2015, file an informal resolution request (IRR) wherein he maintained that he "had numerous altercations with Steve Reynolds while on parole - he repeatedly threatened me that I 'had something coming.' " Schieffer Affidavit ¶ 10; Docket 45-1.

According to Mr. Piekkola, Steve Reynolds had "paid inmates to take care of me." Schieffer Affidavit ¶ 10; Doc. 45-1. Mr. Piekkola asserted in his IRR that "since my arrival to MDSP, I've had inmates who worked for Steve telling me that he repeatedly tried to get inmates to 'handle' me if I was seen." Id.

Mr. Piekkola's IRR requested "serious investigation into this matter and my safety taken serious." Schieffer Affidavit ¶ 11; Doc. 45-1. He wanted "this threat/threats to me to be taken serious." Id.

In response, Mr. Piekkola was notified on July 9, 2015, that, based on the alleged threats, "he had been placed in protective custody." Schieffer Affidavit ¶ 12; Doc. 45-2. Mr. Piekkola was asked to "please provide the names to staff of the inmates threatening you." Id. Subsequently, on July 13, 2015, Mr. Piekkola signed a "Voluntary Request to Discontinue Protective Custody Administrative Detention." Schieffer Affidavit ¶ 13; Doc. 45-3. Mr. Piekkola indicated he was "voluntarily withdrawing my request to appear in front of the Protective Custody Classification Board and no longer feel a need to be placed into protective custody." Id.

At no time while he was in protective custody did defendants DeJong and Travis Tjeerdsma "harass Inmate Piekkola about his relationship with Karri." DeJong Affidavit ¶ 4; Travis Tjeerdsma Affidavit ¶ 17. Travis Tjeerdsma has no recollection of ever having spoken to Mr. Piekkola while he was housed in protective custody, but he is certain that he "would not have harassed Mr. Piekkola about his relationship with Karri." Travis Tjeerdsma Affidavit ¶ 17. Although Tammy DeJong did know Karri Reynolds, it was "more in a professional capacity since she (Karri) was also employed at the MDSP." DeJong Affidavit ¶ 4. Tammy DeJong did not tell Mr. Piekkola that she was "at Karri and Steve's wedding" since she never attended the same. Id.

Tammy DeJong did, as indicated in the amended complaint, later prepare and submit a disciplinary report dated July 13, 2015, charging Mr. Piekkola with "a major rule infraction for unauthorized contact with a former employee." Doc. 19, p. 11, ¶ 49; DeJong Affidavit ¶ 5; Doc. 45-4. Mr. Piekkola was charged with violating Prohibit Act L-27 which prohibits "unauthorized contact with outsiders or visitors." DeJong Affidavit ¶ 5, Doc. 45-4. As indicated in the disciplinary report, "Inmate Piekkola, since 5/1/15 has called an ex-staff member 133 times." Mr. Piekkola was aware that, pursuant to DOC Policy 1.5.D.4, Inmate Access to Telephones, he was not allowed to have telephone contact with Karri Reynolds. As indicated in the disciplinary report, he "has her listed under a fake name on his phone list." DeJong Affidavit ¶ 5; Doc. 45-4. In connection with the July 13, 2015, disciplinary report, Mr. Piekkola appeared before the Unit Disciplinary Committee (UDC) and was "offered a sanction of 30 days loss of phone privileges if Piekkola would plead guilty to the alleged infraction." Doc. 19, p. 12, ¶ 53; Klimek Affidavit ¶ 6.

When Mr. Piekkola "refused to plead guilty to the allegations and requested a disciplinary hearing officer (DHO) hearing," a hearing was scheduled before the DHO pursuant to DOC Policy 1.3.2.C. Doc. 19, p. 12, ¶ 53; Stock Affidavit ¶ 7. Mr. Piekkola was ultimately found guilty by the DHO. Doc. 19, p. 12, ¶ 56; Stock Affidavit ¶ 7; Doc. 45-9. At no point whatsoever during the disciplinary hearing did Mr. Piekkola ever contend that the identity of the "ex-staff member" he had contacted was in dispute. Stock Affidavit ¶ 8. Mr. Piekkola also made no attempt to dispute that he had made the phone calls in question. Stock

32

Affidavit ¶ 8. The sole issue Mr. Piekkola raised during the disciplinary hearing was whether Karri Reynolds was, in fact, a "staff member." Mr. Piekkola argued "it was not a staff member." Stock Affidavit ¶ 8; Doc. 45-9. In finding Mr. Piekkola committed the prohibited act in question, the DHO did not believe there was any question Mr. Piekkola knew he was "not authorized" to contact the "ex-staff member" in question. Stock Affidavit ¶ 9. In reaching that determination, the DHO relied, in part, on the disciplinary report and the statements that Mr. Piekkola had the ex-staff member "listed under a fake name on his list." Stock Affidavit ¶ 9.

The fact that Mr. Piekkola resorted to using a "fake name on his phone list" was enough to suggest to the DHO that Mr. Piekkola was well aware he was not authorized to contact Karri Reynolds. Stock Affidavit ¶ 9. Although Officer Stock was, at one time, briefly involved with Karri Reynolds, he did not believe it adversely affected his ability, as a DHO, to remain impartial. Stock Affidavit ¶ 10. Said involvement with Karri Reynolds occurred prior to 2008, several years before the Disciplinary Hearing in question. Stock Affidavit ¶ 10.

Moreover, at the time of the disciplinary hearing in question, Officer Stock was not aware, prior to the commencement of the hearing, that Karri Reynolds was the "ex-staff member" that Mr. Piekkola had been contacting. Stock Affidavit ¶ 11. The disciplinary report refers only to an "ex-staff member" and does not contain any specific reference to the actual name of said "ex-staff member." Stock Affidavit ¶ 11; Doc. 45-4. When, during the disciplinary hearing, Mr. Piekkola referred to Karri Reynolds by name, the only issue to be decided was whether she "was not a staff member." Stock Affidavit ¶ 12; Doc. 45-

9. According to Mr. Piekkola, "Karri Reynolds was never a DOC employee. Karri was employed by the South Dakota Department of Social Services (DSS)." Doc. 19, p. 11, ¶ 50.

In the opinion of the DHO, that argument was unavailing because DOC Policy 1.5.D.4, Inmate Access to Telephones, referred to "State of South Dakota or contractual employees terminated from employment or who have resigned to avoid termination for inappropriate activity/relations with an inmate." Stock Affidavit ¶ 12; Doc. 45-43 & Doc. 45-44. The DHO believed that under the Policy, Karri Reynolds, though employed by the SDDSS, was nevertheless an employee of the State of South Dakota. Stock Affidavit ¶ 12.

Additionally, the DHO relied on the definition of "staff member" found in DOC Policy 1.1.C.1. According to that policy, a "staff member" included "any person employed by the DOC, full or part time" and it specifically "includes an individual under contact assigned to the DOC, an employee of another state agency assigned to the DOC, and authorized volunteers and student interns." Stock Affidavit ¶ 13, Doc. 45-45 and Doc. 45-46. That Karri Reynolds was previously employed by the Department of Social Services (DSS) was thus, in the opinion of the DHO, irrelevant to whether Inmate Piekkola had committed the prohibited act with which he was charged. Stock Affidavit ¶ 13.

Mr. Piekkola, in an Informal Resolution Request dated July 15, 2015, did not dispute he had contacted Karri Reynolds. His only argument was that she was "not a security staff employee-this individual was not even a DOC employee; she was a DSS employee." Schieffer Affidavit ¶ 14; Doc. 45-5. According to Mr. Piekkola, he had a "First Amendment right to freedom of

association." In response to Mr. Piekkola's July 15, 2015, IRR, Mr. Piekkola was advised, in a response dated July 17, 2015, that "per policy 1.5.D.4 State of South Dakota or contractual employees terminated from employment with the State or who have resigned to avoid termination due to inappropriate activity/relations with an inmate may not be on an inmate's call list." Schieffer Affidavit ¶ 15; Doc. 45-6.

Subsequently, Mr. Piekkola filed a request for administrative remedy dated July 17, 2015. He maintained that "DOC Policy 1.5.D.4 does not apply. Karri was not terminated." Schieffer Affidavit ¶ 16; Doc. 45-7. According to Mr. Piekkola, "she didn't resign to avoid termination due to any inappropriate activity." Mr. Piekkola contended "DCI and Special Security investigated the issue and found no wrongdoing." Schieffer Affidavit ¶ 16; Doc. 45-7. In an administrative remedy response dated August 5, 2015, Mr. Piekkola was informed that "[a]s stated in the Inmate Living Guide, telephone calls and visits are a privilege and subject to the rules of the institution." Schieffer Affidavit ¶ 17; Doc. 45-8. Mr. Piekkola was further informed, "telephone calls and visits can be denied for a specific visitor if a threat to the security and good order of the institution is deemed." Mr. Piekkola was told "your request for telephone calls and visits with this former staff member has been denied." Schieffer Affidavit ¶ 17; Doc. 45-8.

In a subsequent IRR dated July 22, 2015, Mr. Piekkola indicated "I would like to appeal my DHO conviction on 7/22/2015." Schieffer Affidavit ¶ 18; Doc. 45-10. In this IRR, Mr. Piekkola again, did not dispute he had contacted Karri Reynolds. According to Mr. Piekkola, "I didn't see any reason to hide it. She quit on her own terms, was investigated and cleared." Id. A review

of the IRR submitted by Mr. Piekkola on July 22, 2015, wanting to "appeal my

DHO convictions," reveals that there is no reference to Mr. Piekkola  having been

denied an impartial DHO. Doc. 45-10.  Instead, Mr. Piekkola asserted in his IRR,

that "I was never informed not to contact anymore." (sic). Doc. 45-10.

It was obvious to the DHO that Mr. Piekkola was well aware he was "not

authorized to contact the ex-staff member" since he had resorted to using "a

fake name on his phone list." Stock Affidavit ¶ 9.

Mr. Piekkola later made a similar claim in a request for administrative

remedy dated August 3, 2015.  He again indicated he "would like to appeal my

DHO conviction on 7/22." Schieffer Affidavit ¶ 21; Doc. 45-12. Although

indicating he "didn't see any reason to hide it," Mr. Piekkola again alleged he

"was never told in any form not to have contact." Id.  Mr. Piekkola did not

mention anything in his request for administrative remedy, about having been

denied a hearing before an impartial DHO. Doc. 45-12.  An administrative remedy

response was issued on or about September 2, 2015. Rebecca Schieffer advised

Mr. Piekkola "your request has been reviewed. There is sufficient evidence to

support the finding of guilt and the sanction is appropriate." Schieffer Affidavit

¶ 22; Doc. 45-13.

Mr. Piekkola admits in his own pleadings prison officials told him not to

contact Karri Reynolds.  The amended complaint states "immediately after the

DHO hearing Defendant DeJong deactivated Plaintiff's phone account." Doc. 19

p. 12, ¶ 57. Mr. Piekkola, in his amended complaint, also admits he was

"further warned that any future contact with Karri Reynolds would result in

severe consequences." Doc. 19, p. 12, ¶ 58. Despite the above warnings, Mr. Piekkola persisted in his attempts to circumvent DOC Policy 1.5.D.4 by continuing to contact Karri Reynolds. DeJong Affidavit ¶ 10. As indicated in a disciplinary report dated August 4, 2015, Mr. Piekkola, although sanctioned on July 22, 2015, to the loss of phone privileges for 60 days, continued to "make 30 phone calls." DeJong Affidavit ¶ 10; Doc. 45-55. Mr. Piekkola, as described in the August 4, 2015, disciplinary report, was charged with "refusing to obey a verbal or written order of a staff member" in violation of Prohibit Act L-25. DeJong Affidavit ¶ 10; Doc. 45-55. Mr. Piekkola, after being advised of his rights before the DHO, admitted to having committed the prohibited act in question. Doc. 19, p. 12, ¶ 60-61; DeJong Affidavit ¶ 11; Doc. 45-56.

In another disciplinary report dated December 9, 2015, Mr. Piekkola was again charged with having "provided false information to the Inmate Phone System to continue to converse with an ex-staff member that he has been restricted contact with." DeJong Affidavit ¶ 13; Doc. 45-14. As noted in the disciplinary report, "the name the inmate provided for the phone list is not the name on the prepaid money account. The name listed on the prepaid account does not match any name on his phone list." Id. The December 9, 2015, disciplinary report further indicates that, since his last major write-up for this offense on July 22, 2015, Mr. Piekkola "completed 260 calls to this number." DeJong Affidavit ¶ 13; Doc. 45-14. It was determined that the number was "a cell phone number from Omaha" and that "the ex-staff member is living in the Omaha area." Id. A hearing was later conducted before the UDC based upon the December 9, 2015, disciplinary report. Mr. Piekkola was "offered a sanction of loss

of phone for 30 days and administrative detention for 7 days." Doc. 19, p. 13, ¶ 65. Once again, Mr. Piekkola accepted the offer and admitted to having committed the prohibited act in question. Doc. 19, p. 13, ¶ 66; DeJong Affidavit ¶ 14; Doc. 45-57.

On or about February 8, 2016, another disciplinary report was filed, again charging Mr. Piekkola with "unauthorized contact with outsiders or visitors" in violation of Prohibited Act L-27. DeJong Affidavit ¶ 15; Doc. 45-15. As indicated in the report, Mr. Piekkola was "using Inmate 37773 pin to call ex-staff member Karri Reynolds." In a span of less than a week, Mr. Piekkola had made in excess of 20 telephone calls to Karri Reynolds. Mr. Piekkola, on or about February 9, 2016, appeared before the UDC based on the February 8, 2016, disciplinary report. DeJong Affidavit ¶ 16; Doc. 45-16. He was again offered a plea which would result in 5 days of disciplinary segregation as well as the loss of "care packages for 6 months." Again, Mr. Piekkola accepted the plea offer and admitted to having committed the prohibited act in question. DeJong Affidavit ¶ 16; Doc. 45-16.

On April 5, 2016, Mr. Piekkola was again charged in a disciplinary report with "unauthorized contact with outsiders or visitors" in violation of Prohibited Act L-27. Klimek Affidavit ¶ 13; Doc. 45-17. Mr. Piekkola made several telephone calls to Karri Reynolds on April 5, 2016. Once again, all calls were made using another inmate's pin number. Id. The April 5, 2016, disciplinary report further reflects that "during these phone conversations, both Mr. Piekkola and the called party discussed that they are not allowed to call each other." Klimek Affidavit ¶ 13; Doc. 45-17. After having been advised of his rights

before the DHO, Mr. Piekkola again readily admitted to having committed the prohibited act in question. Klimek Affidavit ¶ 14; Doc. 45-18.

By charging Mr. Piekkola with the rule infractions described above the defendants were not attempting to retaliate against Mr. Piekkola. DeJong Affidavit ¶ 17; Klimek Affidavit ¶ 15; Kaufenberg Affidavit ¶ 22; Stock Affidavit ¶ 14; Doyle Affidavit ¶ 12. A number of the named defendants were not even involved in any of the disciplinary actions taken against Mr. Piekkola as a result of his continued attempts to contact Karri Reynolds in violation of DOC Policy 1.5.D.4. Travis Tjeerdsma Affidavit ¶ 17; Dustin Tjeerdsma ¶ 16; Kelly Tjeerdsma ¶ 16. Steve Reynolds resigned from his position at the MDSP on September 12, 2014, which is well before the filing of any of the disciplinary charges now complained of by Mr. Piekkola. Reynolds Affidavit ¶ 1. Secretary Kaemingk wrote a letter to Mr. Piekkola on September 3, 2015, explaining "any disciplinary action or sanctions as a result of your contact and attempted contact with Ms. Reynolds since your return is not retaliation but enforcement of DOC Policy." Kaemingk Affidavit ¶ 44; Doc. 45-48. Secretary Kaemingk's letter further explained Mr. Kaemingk's belief Mr. Piekkola had resorted to "using deceptive methods to contact Ms. Reynolds since your return to the institution." Id.

DOC Policy 1.5.D.4, Inmate Access to Telephones, specifically provides that "State of South Dakota or contractual employees terminated from employment with the State or who have resigned to avoid termination due to inappropriate activities/relations with an inmate may not be on an inmate's

calling list." Dooley Affidavit ¶ 26; Kaemingk Affidavit ¶ 35; Docs. 45-43 and

45-44. Based upon the information obtained during the investigation conducted

by the DCI officials at the MDSP had reason to believe that Karri Reynolds had, in

fact, resigned from her position of employment in order to avoid being terminated

for inappropriate contact with an inmate. Dooley Affidavit ¶¶ 21, 32-33. DOC

officials determined Karri Reynolds was a risk to the good order and security of the

MDSP. Therefore, she was not approved to be on Mr. Piekkola's calling list.

Dooley Affidavit ¶ 29-33. DOC Policy 1.5.D.4 expressly provides that "inmate

access to telephones is subject to limitations which the Warden determines are

necessary to insure the safety and good order of the institution." Dooley

Affidavit ¶ 25; Docs. 45-43 and 45-44. Mr. Piekkola, therefore, was in clear

violation of Prohibited Act L-27 which prohibits an inmate from having

unauthorized contact with an outsider. Doyle Affidavit ¶ 14; Klimek Affidavit ¶

17; DeJong Affidavit ¶ 19; Travis Tjeerdsma Affidavit ¶ 20.

**F.     Claim 7:  Defamation**

On or about October, 2011, Mr. Piekkola was granted parole release and

paroled to the Community Transition Program (CTP) in Sioux Falls, South

Dakota." Doc. 19, p. 6, ¶ 24. In April, 2012, Mr. Piekkola was "arrested for a

DUI in Sioux Falls, South Dakota." A violation warrant was issued and

Mr. Piekkola was "returned to the SDSP." Doc. 19, p. 7, ¶ 33. It was "during

this same timeframe (2011-2012)" that Mr. Piekkola claims defendants Travis

Tjeerdsma, Kelly Tjeerdsma, Dustin Tjeerdsma, and Steve Reynolds sent

"derogatory, harassing and threatening messages to Piekkola and Karri Reynolds." Doc. 19, p. 7, ¶ 32.

Defendants Travis Tjeerdsma, Kelly Tjeerdsma, Dustin Tjeerdsma and Steve Reynolds did not, however, "during this same timeframe (2011-2012)," send derogatory, harassing and threatening messages to Mr. Piekkola. Travis Tjeerdsma Affidavit ¶ 5; Kelly Tjeerdsma Affidavit ¶ 5, Dustin Tjeerdsma Affidavit ¶ 5; Steve Reynolds Affidavit ¶ 20. None of them had access to or knew Mr. Piekkola's cell phone number. Dustin Tjeerdsma Affidavit ¶ 5; Kelly Tjeerdsma Affidavit ¶ 5; Travis Tjeerdsma Affidavit ¶ 5; Steve Reynolds Affidavit ¶ 21.

Defendant Dustin Tjeerdsma, because he once dated Karri Reynolds' younger sister, knew Karri Reynolds' cell phone number, but he did send Karri Reynolds derogatory, harassing or threatening messages. Dustin Tjeerdsma Affidavit ¶ 5. Neither Travis Tjeerdsma nor Kelly Tjeerdsma were in a position to send Karri Reynolds any such messages because they did know or have access to her cell phone number. Travis Tjeerdsma Affidavit ¶ 6; Kelly Tjeerdsma Affidavit ¶ 5.

At no time did either Travis Tjeerdsma, Dustin Tjeerdsma, Kelly Tjeerdsma, or Steve Reynolds send derogatory, harassing or threatening messages to  Mr. Piekkola via Facebook. Dustin Tjeerdsma Affidavit ¶ 5; Kelly Tjeerdsma Affidavit ¶ 5; Travis Tjeerdsma Affidavit ¶ 5. Said individuals simply had no reason whatsoever to communicate with Mr. Piekkola following his release on parole. Id.  Steve Reynolds also did not send any such messages to

Mr. Piekkola "via Facebook" since he was not a "friend" of Mr. Piekkola's on Facebook. Steve Reynolds Affidavit ¶ 21.

Likewise, none of the defendants had access to the information contained in Mr. Piekkola's institutional file after he was released because following his release on parole in October, 2011, Mr. Piekkola's institutional file would no longer have been maintained at the MDSP. Travis Tjeerdsma Affidavit ¶ 10; Dustin Tjeerdsma Affidavit ¶ 9; Kelly Tjeerdsma Affidavit ¶ 9. Pursuant to DOC Policy 1.1.E.1 and 1.4.B.4, Mr. Piekkola's institutional file would have been "forwarded to [his] parole agent" and would no longer been maintained at the MDSP. Travis Tjeerdsma Affidavit ¶ 12; Dustin Tjeerdsma Affidavit ¶ 11; Kelly Tjeerdsma Affidavit ¶ 11; Exhibits 45-22 through 45-25.

It would have been impossible for the defendants to have accessed Mr. Piekkola's personal information from his institutional file for the purpose of making defamatory remarks about him. Travis Tjeerdsma Affidavit ¶ 12; Dustin Tjeerdsma Affidavit ¶ 11; Kelly Tjeerdsma Affidavit ¶ 11. Because the defendants did not have access to the information in question, they could not have used it to make defamatory statements. Id.

Likewise, neither Travis Tjeerdsma, Kelly Tjeerdsma, Dustin Tjeerdsma nor Steve Reynolds, "due to their employment" had access to any information contained within Mr. Piekkola's medical records. Travis Tjeerdsma Affidavit ¶ 7; Dustin Tjeerdsma Affidavit ¶ 12; Kelly Tjeerdsma Affidavit ¶ 12. Those files are kept confidential and are maintained separately from an inmate's DOC file. Tinker Affidavit ¶ 3; Doc. 45-19; Englund Affidavit ¶ 2. Pursuant to SDDOH

Policy P-H-02, Confidentiality of Health Records, "all medical records are to be kept secure at all times and accessible only to authorized personnel." Tinker Affidavit ¶ 2; Doc. 45-19. The same is true regarding Mr. Piekkola's Behavioral Health and alcohol/drug treatment records. Those files are, at all times, kept separate from an inmate's DOC file. Englund Affidavit ¶ 2. Correctional officers simply do not have access to any of the information contained in Mr. Piekkola's behavioral health record. Englund Affidavit ¶¶ 2-8.

It would have been impossible for defendants Kelly Tjeerdsma, Travis Tjeerdsma, Dustin Tjeerdsma or Steve Reynolds to have used personal information contained in Mr. Piekkola's files to make defamatory statements regarding him since they simply did not have access to the information in question. Travis Tjeerdsma Affidavit ¶ 16; Kelly Tjeerdsma Affidavit ¶ 15; Dustin Tjeerdsma Affidavit ¶ 15; Steve Reynolds Affidavit ¶ 17.

## DISCUSSION

### A.     Summary Judgment Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate where the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

The court must view the facts, and inferences from those facts, in the light most favorable to the nonmoving party. See Matsushita Elec. Co. v. Zenith Radio Corp., 475 U.S. 574, 587–88 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Helton v. Southland Racing Corp., 600 F.3d 954, 957 (8th Cir. 2010) (per curiam). Summary judgment will not lie

43

if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Allison v. Flexway Trucking, Inc., 28 F.3d 64, 66 (8th Cir. 1994).

The burden is placed on the moving party to establish both the absence of any genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a).  Once the movant has met its burden, the nonmoving party may not simply rest on the allegations in the pleadings, but must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists.  Anderson, 477 U.S. at 256; FED. R. CIV. P. 56(e) (each party must properly support its own assertions of fact and properly address the opposing party's assertions of fact, as required by Rule 56(c)).

The underlying substantive law identifies which facts are "material" for purposes of a motion for summary judgment.  Anderson, 477 U.S. at 248.  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted."  Id. (citing 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Fed. Practice & Procedure, § 2725, at 93–95 (3d ed. 1983)).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  Id. at 247–48.

Essentially, the availability of summary judgment turns on whether a proper jury question is presented: "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Id. at 250. Though *pro se* litigants like Mr. Piekkola are entitled to a liberal construction of their pleadings, FED. R. CIV. P. 56 remains equally applicable to them. Quam v. Minnehaha Co. Jail, 821 F.2d 522 (8th Cir. 1987). This includes the requirement that Mr. Piekkola respond to defendants' "motion with specific factual support for his claims to avoid summary judgment." Beck v. Skon, 253 F.3d 330, 333 (8th Cir. 2001).

That neither Mr. Piekkola nor Ms. Reynolds filed any opposition to defendants' summary judgment motions does not necessarily mean that summary judgment should be granted. The failure by an opposing party to resist summary judgment "does not automatically compel resolution of [the motion] in favor of" the movant. United States v. One Parcel of Real Property, 27 F.3d 327, 329 n.1 (8th Cir. 1994); Canada v. Union Elec. Co., 135 F.3d 1211, 1213 (8th Cir. 1997). Federal Rule of Civil Procedure 56(e) allows for the possibility that a party may fail to resist another party's assertion of fact. When this happens, the court must still make a determination as to whether the moving party is entitled to judgment in her favor on the merits. One Parcel of Real Property, 27 F.3d at 329 n.1. See also Fed. R. Civ. P. 56(e)(3) (upon a party's failure to contest facts asserted by the movant, the district court may

grant summary judgment *if* the facts and the law show that the movant is entitled to judgment in her favor).

## B.     Prima Facie Case Under § 1983 and Qualified Immunity

Defendants assert that they are entitled to qualified immunity and, therefore, the court should enter summary judgment in their favor.  In addition, they argue that Mr. Piekkola cannot make out a constitutional violation, also entitling them to summary judgment.

In order to show a *prima facie* case under 42 U.S.C. § 1983, Mr. Piekkola must show (1) defendants acted under color or state law and (2) " 'the alleged wrongful conduct deprived him of a constitutionally protected federal right.' " Zutz v. Nelson, 601 F.3d 842, 848 (8th Cir. 2010) (quoting Schmidt v. City of Bella Villa, 557 F.3d 564, 571 (8th Cir. 2009)).

Qualified immunity protects government officials from liability and from having to defend themselves in a civil suit if the conduct of the officials "does not violate clearly established statutory or constitutional rights."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  Qualified immunity is immunity from suit, not just a defense to liability at trial.  Mitchell v. Forsyth, 472 U.S. 511, 526 (1985).  Therefore, the Supreme Court has "repeatedly stressed the importance of resolving immunity questions at the earliest possible stage in litigation."  Hunter v. Bryant, 502 U.S. 224, 236 (1991).

To determine whether an official may partake of qualified immunity, two factors must be determined:  (1) whether the facts that plaintiff has shown make out a violation of a constitutional right and (2) whether that

constitutional right was "clearly established" at the time of the official's acts. Saucier v. Katz, 533 U.S. 194, 201 (2001). If the court finds that one of the two elements is not met, the court need not decide the other element, and the court may address the elements in any order it wishes "in light of the circumstances of the particular case at hand." Pearson v. Callahan, 555 U.S. 223, 236 (2009). Defendants are entitled to qualified immunity if the answer to either of the Saucier prongs is "no."

"Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments," and "protects 'all but the plainly incompetent or those who knowingly violate the law.' " Stanton v. Sims, 571 U.S. ___, 134 S. Ct. 3, 5 (2013) (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 131 S. Ct. 2074, 2085 (2011) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986))). " 'We do not require a case directly on point' before concluding that the law is clearly established, 'but existing precedent must have placed the statutory or constitutional question beyond debate.' " Stanton, 134 S. Ct. at 5. " 'Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines.' " Ambrose v. Young, 474 F.3d 1070, 1077 (8th Cir. 2007) (quoting Hunter, 502 U.S. at 229).

The Supreme Court has stated that "if the defendant does plead the [qualified] immunity defense, the district court should resolve that threshold question before permitting discovery." Crawford-El v. Britton, 523 U.S. 574, 598 (1998) (citing Harlow, 457 U.S. at 818). Only if the plaintiff's claims survive a dispositive motion on the issue of qualified immunity will the plaintiff

"be entitled to some discovery." Id. Even then, the Court has pointed out that FED. R. CIV. P. 26 "vests the trial judge with broad discretion to tailor discovery narrowly and to dictate the sequence of discovery." Id. Such discretion includes the ability to establish limits on the number of depositions and interrogatories, to limit the length of depositions, to limit the number of requests to admit, to bar discovery on certain subjects, and to limit the time, place, and manner of discovery as well as its timing and sequence. Id. In this case, the defendants moved for a protective order to stay discovery on July 7, 2016. Docket 33. The district court granted the motion on July 8, 2016. Docket 37.

## C.   Mr. Piekkola's Claims for Injunctive Relief

At the outset, the court notes that in the "Request for Relief" section of his amended complaint, (Docket 19), Mr. Piekkola requested a "preliminary and permanent injunction . . ." Id. ¶¶ 215-216. The court takes judicial notice pursuant to FED. R. EVID. 201 that Mr. Piekkola was released from the custody of the State of South Dakota upon the expiration of his sentence on May 2, 2017. He is not on parole with the State of South Dakota or otherwise subject to supervision by the state. Because Mr. Piekkola has been released from MDSP and has completed his sentence, his claims for injunctive relief are moot. "A prisoner's claim for injunctive relief  is moot if the prisoner is no longer subject to the conditions of which he complained." Kurtz v. Denniston, 872 F.Supp. 631, 636 (N.D. Ia. 1994). Because Mr. Piekkola is no longer subject to the allegedly unconstitutional restrictions about which he complains

in this lawsuit, his claims for injunctive and declaratory relief are moot.  See
Beaulieu v. Ludeman, 690 F.3d 1017, 1024 (8th Cir. 2012) (holding plaintiffs'
case was moot because they had been transferred out of the "annex" where
they argued their constitutional rights were violated); Gladson v. Iowa Dept. of
Corr., 551 F.3d 825, 835 (8th Cir. 2009) (plaintiff's claims were rendered moot
when he was no longer incarcerated).  Accordingly, this court respectfully
recommends those claims be dismissed.

**D.**     **The Merits of Mr. Piekkola's Surviving Claims**

      **1.**     **Claim 3: Violation of Right to Privacy**

At the base of this cause of action is Mr. Piekkola's allegation that,
during the time he was initially released on parole through the duration of his
first parole revocation and re-incarceration at SDSP (October, 2011 through
October, 2013) the defendants accessed private information contained in
Mr. Piekkola's institutional file including medical and mental health records as
well as his telephone conversations with Karri Reynolds and disclosed this
information to third parties (namely Karri Reynolds or her ex-husband Steve
Reynolds) without any legitimate penological purpose.

In general, the "Constitution protects individuals against invasion of
their privacy by the government." McCaslin v. Campbell, 108 F.3d 1382 (1997)
(per curium).  "The protection against public dissemination of information is
limited and extends only to highly personal matters representing 'the most
intimate aspects of human affairs.' " Id. (quoting Eagle v. Moran, 88 F.3d 620,
625 (8th Cir. 1996)).  "[T]o violate the constitutional right of privacy the

49

information disclosed must be either a shocking degradation or an egregious humiliation . . ., or a flagrant breach of a pledge of confidentiality which was instrumental in obtaining personal information." Van Zee v. Hanson, 630 F.3d 1126, 1128 (8th Cir. 2011) (quoting Cooksey v. Boyer. 289 F.3d 513, 516 (8th Cir. 2002)).

An inmate's right to privacy, however, is diminished due to his status as an inmate. See Hudson v. Palmer, 468 U.S. 517, 526 (1984) ("The recognition of privacy rights for prisoners in their individual cells simply cannot be reconciled with the concept of incarceration and the needs and objectives of penal institutions."). The Eighth Circuit has recognized that "prison officials must balance an inmate's right to privacy with the security needs of the institution." Hill v. McKinley, 311 F.3d 899, 904 (8th Cir. 2002). The Eighth Circuit has not specifically decided whether prison records are the type of information constitutionally protected under McCaslin and Van Zee. One court, at least, has found prisoners retain a "limited right to privacy." See e.g. Powell v. Schriver, 175 F.3d 107, 112 (2d Cir. 1999) (holding the "gratuitous disclosure of an inmate's confidential medical information as humor or gossip . . . is not reasonable *not* reasonably related to a valid penological interest, and it therefore violates the inmate's constitutional right to privacy."). This seems to be what Mr. Piekkola alleged in his complaint. In their brief, the defendants discuss at length whether they should be entitled to qualified immunity, since the law is not clear about the extent to which information about an inmate is

entitled to the protection of a constitutional right to privacy in the first instance. See defendants' brief, Docket 45 at pp. 42-48.

As explained above, the two-pronged qualified immunity analysis asks whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right and if so, whether said right was clearly established at the time of the violation. Saucier, 533 U.S. at 201. Those questions can be asked and answered in whichever order the court chooses. Pearson, 555 U.S. at 236. However, if Mr. Piekkola fails to show a constitutional violation, "there is no reason to reach the qualified immunity issue." Wright v. City of Philadelphia, 409 F.3d 595, 600 (3d Cir. 2005).

Mr. Piekkola has failed to show the defendants violated his constitutional right to privacy for a couple of reasons. First, as the district court explained in its March 8, 2016, order, any claims which arise under 42 U.S.C. § 1983 are subject to a statute of limitations. See Docket 14, p. 12-13. Mr. Piekkola does not explain in his amended complaint exactly when the defendants allegedly improperly accessed his institutional files for purposes of disseminating his personal information, other than his broad assertion that these actions occurred sometime between his release in October, 2011, and the end of his re-incarceration at the SDSP in October, 2013. Mr. Piekkola, however, did not file this pending lawsuit until September 21, 2015. See Docket 1. The district court explained the statute of limitations issue in its March 6, 2016, order:

> "The statute of limitations for claims brought under 42 U.S.C. § 1983 is generally the applicable state law period for personal injury torts." Strandlund v. Hawley, 532 F.3d 741, 746 (8th Cir. 2008 (citing City of Rancho Palos Verdes, Cal. v. Abrams, 544 U.S.

> 113, 124 n. 5 (2005)).  Because 42 U.S.C. § 1983 does not contain
> a specific statute of limitations, the United States Supreme Court
> has instructed courts to apply the analogous state statute of
> limitations.  Bell v. Fowler, 99 F.3d 262, 265-66 (citing Wilson v.
> Garcia, 471 U.S. 261, 266-68 (1985)).  Under South Dakota law,
> "civil rights actions must be brought within three years after the
> alleged constitutional deprivation occurred or the action will be
> barred."  Id. at 266; SDCL 15-2-15.2. . . . Thus, [Mr. Piekkola's]
> limitations period stretches back to September 21, 2012.

See Docket 14 at pp. 12-13.  Even assuming Mr. Piekkola presented sufficient

evidence to prove the defendants accessed his personal information, therefore,

recovery for any such actions which occurred before September 21, 2012,  is

barred by the statute of limitations.

More important however, is Mr. Piekkola's failure to sufficiently oppose

the defendants' summary judgment motion.  In their summary judgment

papers, the defendants have expressly denied that they *could have* or that they

*did* improperly access Mr. Piekkola's private information.  The defendants deny

they accessed Mr. Piekkola's institutional file, his medical records, his mental

health records, or his telephone calls with Karri.  The defendants have properly

supported their denials with affidavits and with supporting documentation

explaining why they *did not* and *could not have* accessed Mr. Piekkola's

institutional or medical information even if they had wanted to do so.

Mr. Piekkola, on the other hand, did not respond to the defendants'

summary judgment motion and has supported his claims with nothing but the

conclusory allegations contained within his amended complaint.   In his

amended complaint, Mr. Piekkola vaguely alleges the defendants improperly

accessed and then released his private information, but he does not specify

*what* specific information was improperly accessed or released, by whom, or when.  If Mr. Piekkola had any proof whatsoever that any particular defendant improperly accessed his private information, responding to the defendants' summary judgment motion was his opportunity to supply this court with proof of his claims.  He failed to do so.

Part (c) of Rule 56 provides as follows:

(1) ***Supporting Factual Positions***.  A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials; or

> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

(2) ***Objection That a Fact Is Not Supported by Admissible Evidence***.  A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.

(3) ***Materials Not Cited.***  The court need consider only the cited materials, but it may consider other materials in the record.

(4) ***Affidavits or Declarations.***  An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

<u>See</u> Fed. R. Civ. P. 56(c).

The court may grant defendants' summary judgment motion if the record is otherwise sufficient and the opposing party fails to support its own assertion of fact, or to address the moving party's assertion of fact as required by Fed. R.

Civ. P. 56(c). See Fed. R. Civ. P. 56(e)(3). "Rule 56(e) provides that judgment shall be entered against the nonmoving party unless affidavits or other evidence set forth specific facts showing that there is a genuine issue for trial. The object of this provision is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." Lujan v. National Wildlife Federation, 497 U.S. 871, 888 (1990).

"[C]onclusive assertions of ultimate fact are entitled to little weight when determining whether a nonmovant has shown a genuine issue of fact sufficient to overcome a summary judgment motion supported by complying affidavits." Miller v. Solem, 728 F.2d 1020, 1024 (8th Cir. 1984) (citing 10A C. Wright, A. Miller & M. Kane, Federal Practice & Procedure, § 2727 at pp. 157-59 (1983)). In Miller, the plaintiff opposed the defendants' summary judgment motion with his own affidavit which contained "sweeping conclusory allegations that both defendants intentionally failed to protect him . . ." Miller, 728 F.2d at 1025. The affidavits he submitted were deficient because (among other reasons) they contained inadmissible hearsay. Id. at 1026. The court explained the plaintiff's conclusory allegations were "unsupportable, frivolous, and cannot withstand summary judgment." Id. See also, Wells Dairy Inc. v. Travelers Indemnity Co., 241 F. Supp.2d 945, 956 (N.D. Ia. 2003) ("Hearsay statements which cannot be categorized as a hearsay exception, conclusory allegations, legal arguments, and statements not based on personal knowledge may be stricken.") (citing cases).

Likewise, in <u>Maiorana v. MacDonald</u>, 596 F.2d 1072, 1080 (1st Cir. 1979) the plaintiff's affidavits were rejected because the defects were "numerous." <u>Id.</u> The court noted the plaintiff's affidavits were not based on personal knowledge, but instead were based on statements she heard or documents she read, but the properly authenticated documents were not attached to the affidavit. <u>Id.</u> Her affidavit contained inadmissible hearsay. <u>Id.</u> And, "[p]articular portions of the counteraffidavits were improper because they purported to examine the defendants' thoughts as well as their actions. Other portions contained impermissible speculation or conclusory language." <u>Id.</u>

In <u>Perez v. Volvo Corp.</u>, 247 F.3d 303 (1st Cir. 2001), the sufficiency of the following paragraph from Mr. Gonzalez's affidavit was the subject on appeal:

> Volvo knew about the higher AUM invoice cost figures. From my personal discussions with various Volvo representatives, I know that Volvo was fully aware of the relationship between Trebol and AUM, including the nature and amount of the guarantees.

<u>Id.</u> at 315. The court observed "if admissible, these statements are little short of damning." <u>Id.</u> The statements were not admissible, however, because though they purported to be based on Mr. Gonzalez's personal knowledge, they were "totally lacking in specificity . . ." <u>Id.</u>

> Affidavits purporting to describe meetings or conversations need not spell out every detail, but to receive weight at the summary judgment stage they must meet certain rudiments. Statements predicated upon undefined discussions with unnamed persons at unspecified times are simply too amorphous to satisfy the requirements of Rule 56 . . . even when proffered in affidavit form by one who claims to have been a participant.

Id. (citations omitted).  See also James Wm. Moore, et. al. Moore's Federal Practice § 56.14(1)(d) (3d ed. 1997) ("The affidavit, in addition to presenting admissible evidence, must be sufficiently specific to support the affiant's position.").  In Perez, the court determined the above language, along with other language in the affidavit was insufficient.  Perez, 247 F.3d at 316. "Although these statements purport to deal with Volvo's knowledge of ongoing events, they are conclusory rather than factual . . . such gauzy generalities are not eligible for inclusion in the summary judgment calculus."  Id. at 316-17. The same standards apply to the allegations in Mr. Piekkola's amended complaint.  The allegations in Mr. Piekkola's amended complaint are speculative, conclusory, and contain sweeping generalities.  Mr. Piekkola merely states that at some unspecified time, the defendants accessed his files and used unspecified information to make "uncouth" statements about him to Karri "and others."  Docket 19, ¶ 100.  Without more, this claim is wholly insufficient to withstand the defendants' well-supported summary judgment motion.  Miller, 728 F.2d at 1025.

Mr. Piekkola has failed respond to defendants' "motion with specific factual support for his claims to avoid summary judgment."  Beck, 253 F.3d at 333.  As such, there is no genuine issue of material fact remaining for trial, and this court therefore recommends that the defendants" motion for summary judgment as to this claim be granted.  Because Mr. Piekkola has failed to show the defendants violated his constitutional right to privacy, "there is no reason to reach the qualified immunity issue."  Wright, 409 F.3d at 600 .

## 2.    Claim 4: First Amendment Right To Communicate/Associate

In this portion of his amended complaint, Mr. Piekkola asserts that after he returned to the MDSP on a parole violation in June, 2015, the defendants "prohibited him from any association with Karri Reynolds." Docket 19, ¶ 123. He asserts he has been wrongfully prevented from communicating with Karri, Id. at ¶ 125. He asserts that he and Karri had planned on getting married after his release from incarceration, but the defendants made those plans "impossible." Id. at ¶ 127. At the base of Mr. Piekkola's assertions in this cause of action is his claim that during his re-incarceration at MDSP, he was denied permission to communicate (speak on the phone) with Karri Reynolds. Id. ¶¶ 49-66. Mr. Piekkola asserts the defendants had no legitimate penological interest in denying his efforts to communicate with Karri. Id. ¶ 125. On screening, the district court construed this claim as one arising under the First Amendment right to communicate with the outside world. See Docket 14, pp. 17-18.

"A prisoner has no right to unlimited telephone use." Benzel v. Grammer, 869 F.2d 1105, 1107 (8th Cir. 1989). "Although in some instances prison inmates may have a right to use the telephone for communication with relatives and friends, prison officials may restrict that right in a reasonable manner, 'subject to limitations in the face of legitimate security interests of the penal institution.'" Benzel, 869 F.2d at 18 (citing Hutchings v. Corum, 501 F. Supp. 1276, 1296 (W.D. Mo. 1980)). Further, in Holloway v. Magness, 666 F.3d 1076, 1079 (8th Cir. 2012) the Eighth Circuit cautioned that "the extent

of inmates' First Amendment right to communicate with the outside world is a fact-intensive universe." Id.  The defendants in this case assert their interest in maintaining security at MDSP constituted a legitimate penological interest in denying Mr. Piekkola's repeated attempts to contact Karri by telephone during his re-incarceration at MDSP.  The court agrees.

In Beaulieu v. Ludeman, 690 F.3d 1017 (8th Cir. 2012), the court canvassed decisions relating to restrictions on phone use by those who are involuntarily confined.  Id. at 1039.  Though Beaulieu is about patients who were involuntarily civilly committed in the Minnesota Sex Offender Program (MSOP), the court noted the law applicable to them is comparable to the  prison setting.  Id.  In Beaulieu the facility instituted a policy which prohibited the patients from receiving live incoming calls at all, which monitored all outgoing calls except privileged attorney calls, and which provided for only incoming voicemails to be left for patients which were screened before patients received them.  The facility articulated security reasons for this policy after patients escaped, and officials learned the escapes were facilitated by telephone conversations with people from the outside.  Id. at 1040.

During the course of investigating suspicious activity, the investigators learned the plaintiff, Mr. Beaulieu, had formed an inappropriate relationship with a former program counselor who subsequently resigned her position at the facility.  Id.  After the counselor resigned, Mr. Beaulieu conversed with her over the phone 508 times over a three-month period.  By monitoring these conversations, staff discovered Mr. Beaulieu and the former counselor were

planning to smuggle drugs into the facility.  As a result, Mr. Beaulieu was arrested and charged with attempting to bring drugs into a state hospital.  Id. The court held that the policy which forbid incoming calls and monitored all voicemails and outgoing calls was therefore reasonably related to the MSOP's security interests of preventing crimes and maintaining a safe environment.  Id. at 1039-40.

The Beaulieu court recognized that greater restrictions are allowed on a prisoner's First Amendment rights than in other settings.  Id. at 1039.  Then, the court cited Turner v. Safley, 482 U.S. 78, 89-90 (1987).  Turner established a four-part test to  determine whether prison regulations are reasonably related to legitimate penological interests.  The four Turner factors are:  (1) whether there is a valid, rational connection between the regulation and legitimate governmental interests put forward to justify it; (2) whether alternative means of exercising the right remain open to prisoners; (3) whether accommodation of the asserted right will trigger a "ripple effect" on fellow inmates and prison officials; and (4) whether a ready alternative to the regulation would fully accommodate the prisoner's rights at de minimis cost to the valid penological interest.  Id.

In this case, the defendants explain Mr. Piekkola was not allowed to have telephone contact with Karri because Karri was formerly a staff member (as that term is defined pursuant to DOC Policy 1.1.C.1) who they had reason to believe had resigned her position at MDSP to avoid being fired.  Dooley affidavit ¶ 21, Kaemingk affidavit ¶ 32.  Pursuant to DOC Policy 1.5.D.4, such persons

59

are not allowed to be on an inmate's call list without the Warden's approval. See Dooley affidavit ¶ 26; Kaemingk affidavit ¶ 11.   Because Karri Reynolds had undergone extensive training relevant to security issues at MDSP, Warden Dooley and Secretary Kaemingk viewed telephone contact between Karri and inmate Piekkola while Mr. Piekkola was incarcerated at MDSP as a security risk.  Dooley affidavit ¶¶ 29-33; Kaemingk affidavit ¶¶ 38-42.

The defendants have articulated a valid, rational connection between Policy 1.5.D.4 and their interest in maintaining prison security at MDSP.  It is rational to conclude that a former MDSP employee who ignored DOC policy prohibiting ethical rules against personal relationships with inmates might be tempted to share security information with an inmate during a telephone conversation.

It is unclear whether alternative means of communication existed for Mr. Piekkola and Karri.  In his amended complaint, Mr. Piekkola alleged he was prohibited from *any* contact with Karri including "mail, third party, etc." <u>See</u> Docket 19, ¶ 58.  Even if this is so, inmate personal contact with former employees has been affirmed as constitutional under the <u>Turner</u> analysis as being legitimately related to the security interests of the institution.  <u>See e.g.</u> <u>Caraballo-Sandoval v. Honstead</u>, 35 F.3d 521, 525  (11th Cir. 1994); <u>Dixon v. Cain</u>, 2015 WL 13309343 at *5  (M.D. La. Sept. 2, 2015) (upholding visitation policy that denies visitation by ex-employees; applying <u>Turner</u> and citing cases).

Neither Mr. Piekkola nor the defendants have suggested an accommodation or a ready alternative that would have facilitated Mr. Piekkola's ability to communicate with Karri during Mr. Piekkola's re-incarceration at MDSP, so this court will not conduct an in-depth analysis of these <u>Turner</u> factors. Suffice it to say that, given Karri's knowledge of the security measures in place at MDSP, 100% monitoring of any communication between the two of them would not have been an unreasonable requirement. Such an alternative would surely have been a labor-intensive, costly and therefore infeasible option. The court concludes, applying the <u>Turner</u> factors, that prohibiting Mr. Piekkola from communicating with Karri during his re-incarceration at MDSP did not violate Mr. Piekkola's constitutional rights. The defendants' decision to prohibit Mr. Piekkola's communication with Karri was reasonably related to the defendants' legitimate and articulated interest in institutional security at the MDSP. <u>Turner</u>, 482 U.S. at 89-90; <u>Beaulieu</u>, 690 F.3d at 1041; <u>Caraballo-Sandoval</u>, 35 F.3d at 525; <u>Dixon</u>, 2015 WL 13309343 at *5. For these reasons, no genuine issue of material facts exists as to Mr. Piekkola's First Amendment claim. This court recommends the defendants' motion for summary judgment be granted as to this claim.

Unlike the first issue discussed in this opinion, the defendants readily acknowledge that they prohibited contact between Mr. Piekkola and Karri Reynolds. But they assert they should prevail on this issue not only because their conduct did not violate Mr. Piekkola's constitutional rights (on this score the court agrees), but also because they are entitled to qualified immunity.

Should reviewing courts disagree with this judge on the issue of whether the defendants violated Mr. Piekkola's constitutional rights by not allowing him to communicate with Karri during his re-incarceration at MDSP, the defendants alternatively are entitled to qualified immunity as to this issue.

As explained in section B above, qualified immunity is designed to protect government officials from liability and from having to defend themselves in a civil suit if the conduct of the officials "does not violate clearly established statutory or constitutional rights." Harlow, 457 U.S. at 818. " 'We do not require a case directly on point' before concluding that the law is clearly established, 'but existing precedent must have placed the statutory or constitutional question beyond debate.' " Stanton, 134 S. Ct. at 5. " 'Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines.' " Ambrose, 474 F.3d at 1077 (quoting Hunter, 502 U.S. at 229).

There is no clearly established United States Supreme Court or Eighth Circuit precedent which has broadened beyond debate a prison inmate's First Amendment rights so widely as to include the unfettered ability, while still incarcerated, to communicate with a former prison employee. In fact, the cases cited above suggest that an inmate does *not* have such a right. The defendants, therefore, did not "transgress a bright line" when they prohibited Mr. Piekkola from communicating with Karri Reynolds while Mr. Piekkola was incarcerated at MDSP. The defendants are entitled to qualified immunity as to this claim. Harlow, 457 U.S. at 818; Ambrose, 474 F.3d at 1077 . For this

reason as well, this court recommends the defendants' motion for summary judgment be granted as to this claim.

### 3.  Claim 6:  Retaliation

In his amended complaint, Mr. Piekkola alleges the defendants took certain actions against him in retaliation for exercising his First Amendment right to communicate with Karri Reynolds.  Docket 19 at ¶¶ 47-49, 53-61, 64-66.  Specifically, as found by the district court on screening, Mr. Piekkola alleges he was charged with rule infractions, placed in administrative detention multiple times, harassed while in detention, and had his phone account deactivated, either in retaliation for attempting to assert his First Amendment right to communicate with Karri or in retaliation for using the grievance process to complain about the fact that defendant Reynolds allegedly put a "hit" out on him by asking other MDSP inmates to harm him.   Id.

"A prisoner's Eighth Amendment rights are violated if prison officials 'impose a disciplinary sanction against a prisoner in retaliation for the prisoner's exercise of his constitutional right.' " Meuir v. Greene County Jail Employees, 487 F.3d 1115, 1119 (8th Cir. 2007).  See also Haynes v. Stephenson, 588 F.3d 1152, 1155 (8th Cir. 2009).  A *prima facie* case of retaliatory discipline requires a plaintiff to show (1) that he exercised a constitutionally protected right, (2) that he was subsequently disciplined by prison officials, and (3) the motive for imposing the discipline was the exercise of the constitutional right.  Id.

To prevail on a claim of retaliation for violation of a First Amendment right, the plaintiff must show (1) that he engaged in a protected activity, (2) that the government defendant took adverse action against the plaintiff that would chill a person of ordinary firmness from continuing in the activity; and (3) that the adverse action was motivated at least in part by the exercise of the protected activity.  Santiago v. Blair, 707 F.3d 984, 991 (8th Cir. 2013).

The third element of the *prima facie* case requires the plaintiff to show that, "but for" the retaliatory motive, the disciplinary action would not have been taken.  Haynes, 588 F.3d at 1156.  The "but for" test applies to the defendants' motive, not to causation.  Beaulieu, 690 F.3d at 1025.   The "causal connection is generally a jury question, . . . [but] it can provide a basis for summary judgment when the question is so free from doubt as to justify taking it from the jury."  Beaulieu, 690 F.3d at 1025.

In Meuir the plaintiff had bleeding gums and toothaches for which he sought medicated mouthwash.  Meuir, 487 F.3d at 1117.  Defendants refused to provide the mouthwash, but instead gave him Tylenol and urged him to rinse his mouth with salt water.  Id.  After plaintiff's dental complaints continued, a visit to an outside dentist was scheduled; however, fearing that the dentist would pull all his teeth, the plaintiff refused to go.  Id. at 1117-18.  Thereafter, the jail officials refused to give the plaintiff free Tylenol for his toothaches, although the plaintiff could still obtain Tylenol from the commissary at his own expense.  Id. at 1118.  The plaintiff brought suit, alleging retaliatory discipline.  Id.  The case was dismissed on defendant's

rationale that plaintiff's refusal to go to the dentist convinced defendants that his dental condition was not that serious after all.  Id. at 1119.

In Haynes, a prisoner filed a grievance against a prison employee alleging the employee cursed at the prisoner and threatened him.  Haynes, 588 F.3d at 1155.  The employee responded by filing a disciplinary charge against the prisoner, alleging that the prisoner had filed a grievance on false charges.  Id. This prompted prison officials to transfer the prisoner from his normal cell to a mosquito-infested, hot and humid cell where he received reduced shower and exercise privileges and could not visit the prison library.  Id.  The prisoner then filed a retaliatory discipline claim in court.  Id.  Defendants in the lawsuit argued that transfers to different cells did not constitute discipline, negating the second element of the *prima facie* case.  Id.  The court held that the filing of the disciplinary charge itself was sufficient to satisfy the second element.  Id. at 1156.

In Cornell v. Woods, 69 F.3d 1383, 1386-88 (8th Cir. 1995), prison officials filed a disciplinary charge against a prisoner and the prisoner was transferred to a higher-security prison after he had cooperated with an internal affairs investigation at his prison implicating a prison guard.  The prisoner then brought suit under § 1983 alleging that the defendants had disciplined him in retaliation for exercising his constitutional right to cooperate with the IA investigation.  Id. at 1387.  Although the court acknowledged that prisoners have no right to remain in a particular prison, and that prison officials may transfer a prisoner for any reason or no reason, the court held that defendants

could not transfer a prisoner in retaliation for exercising a constitutional right. Id. at 1387-88.  The court held that the plaintiff had a constitutional right to cooperate with the internal prison investigation.  Id. at 1388.  If the cooperation in the investigation was the "but for" reason for the plaintiff's transfer to the more-secure prison, plaintiff made out a *prima facie* case of retaliatory discipline.  Id. at 1388-89.  If, however, the discipline or transfer was made because of "an actual violation of prison rules or regulations, then" the retaliatory discipline claim fails.  Id. at 1389; Santiago, 707 F.3d at 993.

Where a plaintiff engaged in behavioral infractions nine times in the month immediately preceding his transfer, and where transfers were appropriate to address behavioral problems, the plaintiff failed to prove that his exercise of his constitutional right was a "but for" cause of the transfer. Beaulieu, 690 F.3d at 1026-27.

Here, Mr. Piekkola cannot prevail on his retaliation claim regarding his communication with Karri because, as explained in section 2 above, the conduct for which he claims he was retaliated against (attempting to communicate with Karri) was not constitutionally protected.  If a prisoner violates a legitimate prison regulation, he is not engaged in the  "protected conduct" which is a requirement for any successful retaliation claim.  Haynes, 588 F.3d at 1155; Smith v. Campbell, 250 F.3d 1032, 1037 (6th Cir. 2001); Thaddeus-X v. Blatter, 175 F.3d 378, 395 (6th Cir. 1999) (if a prisoner violates a legitimate prison regulation, he is not engaged in "protected conduct.").

Other than his use of the grievance process,[5] Mr. Piekkola's communication with Karri is the only conduct he alleges as "protected conduct" (i.e. a constitutional right) which he believes triggered the supposed retaliation. Because Mr. Piekkola did not engage in a protected activity, the court need not proceed beyond step one in the retaliation analysis. Smith, 250 F.3d at 1037; Thaddeus-X, 175 F.3d at 395. Mr. Piekkola does not seriously dispute that the disciplinary actions taken against him for communicating with Karri were supported by "some evidence." Henderson v. Baird, 29 F.3d 464, 469 (8th Cir. 1994). This essentially "checkmates" his retaliation claim. Id. (citing Superintendent v. Hill, 472 U.S. 445, 454-56 (1985)).

As for his claim that the defendants retaliated against him for using the administrative remedy process, that claim also fails. Specifically, Mr. Piekkola alleges in his amended complaint that when he used the administrative remedy process to complain that defendant Reynolds had, before he resigned[6] from the MDSP, put a "hit" on Mr. Piekkola, the defendants retaliated by placing Mr. Piekkola in administrative detention. See Docket 19, ¶¶ 44-49.

The defendants, however, explained in their affidavits that the reason for Mr. Piekkola's placement in administrative segregation was not that he exercised his constitutional right to use the administrative remedy process, but instead for Mr. Piekkola's own safety and to comply with Mr. Piekkola's

[5] Mr. Piekkola's claim that his constitutional right to use the grievance process also triggered retaliation is discussed below.

[6] Defendant Reynolds had resigned from MDSP in September, 2014. Reynolds Affidavit ¶ 7. Mr. Piekkola did not return to MDSP until nine months later in June, 2015. Docket 19, ¶ 45.

request to investigate his claim that he was being threatened.  See Docket 45-1; Schieffer Affidavit, ¶ 2.  In response to his claim he was being threatened, Mr. Piekkola was placed in protective custody, and asked to provide the names of the other inmates who were threatening him.  Docket 45-2.  Mr. Piekkola, however, did not provide any names.  Instead, he withdrew his request for an investigation and asked that protective custody be discontinued.  Schieffer Affidavit ¶ 13.  Mr. Piekkola indicated he no longer believed protective custody was necessary.  Id.  Thereafter, Mr. Piekkola was released from protective custody.  Docket 19, ¶ 47.  Mr. Piekkola, therefore, has failed to show that the exercise of a constitutional right was the "but for" cause of his placement in administrative segregation.  Beaulieu, 690 F.3d at 1026-27.

For all these reasons, no genuine issue of material fact exists for trial regarding Mr. Piekkola's retaliation claim.  This court recommends the defendants' motion for summary judgment be granted.

Alternatively, for the same reasons explained in section 2 above, if a reviewing court disagrees with this court's decision regarding the absence of Mr. Piekkola's constitutional right to communicate with Karri while Mr. Piekkola was re-incarcerated at MDSP, defendants alternatively are entitled to qualified immunity as to whether they should be liable for money damages under § 1983 for retaliation for subjecting Mr. Piekkola to disciplinary action under the DOC policies which forbid such communication.

There is no clearly established United States Supreme Court or Eighth Circuit precedent which has broadened beyond debate a prison inmate's First

Amendment rights so widely as to include the unfettered ability, while still incarcerated, to communicate with a former prison employee. In fact, the cases cited above suggest that an inmate does *not* have such a right. The defendants, therefore, did not "transgress a bright line" when they prohibited Mr. Piekkola from communicating with Karri Reynolds while Mr. Piekkola was incarcerated at MDSP. As such, the defendants could not have known that they should not have disciplined Mr. Piekkola for violating the policies that were in place forbidding such communication, and that they would therefore be subjecting themselves to liability for retaliation under § 1983. The defendants are entitled to qualified immunity as to this claim. Harlow, 457 U.S. at 818; Ambrose, 474 F.3d at 1077 . For this reason as well, this court recommends the defendants' motion for summary judgment be granted as to this claim.

**4.    Claim 7: Defamation**

In this portion of his amended complaint, Mr. Piekkola asserts the Tjeerdsma defendants, along with defendant Steve Reynolds defamed him by making "derogatory, harassing and threatening" statements to Mr. Piekkola and to Karri. See amended complaint, Docket 19, ¶ 32. Mr. Piekkola does not specify what, exactly, these "derogatory, harassing and threatening" statements were. Though Mr. Piekkola identifies some of the statements allegedly made by defendant Steve Reynolds (see amended complaint, Docket 19, ¶ 39) he does not specify to whom, if anyone other than himself and Karri, these statements were made. In their affidavits, the Tjeerdsma defendants deny making any such statements. See Dustin Tjeerdsma affidavit; Kelly Tjeerdsma affidavit;

Travis Tjeerdsma affidavit. Steve Reynolds denies he initiated any contact with Mr. Piekkola. He denies he called Mr. Piekkola an assaulter, thief, or a drug addict, but admits that in response to statements he received from an unknown telephone number which he assumed was Mr. Piekkola's, Steve responded something to the effect "I may be many things, but at least I am not a convicted felon." Reynolds Affidavit ¶ 23.

Under South Dakota law, defamation consists of either libel or slander. Guilford v. Nw. Pub. Serv., 581 N.W.2d 178, 180 (S.D. 1998) (citing SDCL § 20-11-2). "Slander is a false and unprivileged publication, other than libel, which . . . by natural consequence, causes actual damage." SDCL § 20-11-4.

Mr. Piekkola's defamation claim fails for a couple of reasons.[7] First, he has failed to meet the defendants' summary judgment motion with any evidence at all to support his claims. The defendants deny they made the defamatory remarks about Mr. Piekkola, and Mr. Piekkola did not counter the

---

[7] In their brief, the defendants assert this claim should be dismissed because Mr. Piekkola did not give notice of his claim pursuant to SDCL § 3-21-2, which requires notice be given within 180 days of occurrence if a person wishes to bring a suit for damages against a public entity or its employees. They also assert the defamation claim should be dismissed because Mr. Piekkola failed to bring this action within one year, pursuant to the statute of limitations pertaining to causes of action against the State per SDCL § 21-32-2.

This court does not interpret Mr. Piekkola's amended complaint to assert that the defendants' alleged actions in sending Mr. Piekkola nasty texts and mean Facebook messages were carried out as part of their duties as prison officials at the MDSP—in fact Mr. Piekkola alleged they were carried out as a personal vendetta for having stolen defendant Reynold's wife. See Docket 45-47. The defendants have not cited, and the court has not found, any authority for the proposition that, had defendants actually defamed Mr. Piekkola on Facebook or by text, either one of those statutes would apply to them while acting *outside the scope of their employment as MDSP employees*. The court therefore does not rely on either of those bases in the dismissal of the defamation claim.

defendants' denials with anything other than the conclusory allegations in the amended complaint.  This is insufficient to resist summary judgment. Anderson, 477 U.S. at 256; FED. R. CIV. P. 56(e) (each party must properly support its own assertions of fact and properly address the opposing party's assertions of fact, as required by Rule 56(c)).

Next, at the base of Mr. Piekkola's defamation complaint appears to be his assertion that the defendants made disparaging remarks about him *to him*. See e.g. Docket 45-47 (Mr. Piekkola's letter to Dennis Kaemingk, complaining that while he was on parole, *he* was constantly bombarded with text messages and Facebook messages from MDSP employees).[8]  But a cause of action does not lie for defamation unless the defamatory remarks are published to a *third party*.  Two people having an argument and saying nasty things to one another, without either of them saying those nasty things in the presence of a third person does not a defamation claim make.  See SDCL § 20-11-2 through 20-11-4 (defining defamation, libel and slander under South Dakota law; requiring *publication* of a false statement).  As explained by the Eighth Circuit, "[i]n order for a statement to be considered defamatory it must be communicated to someone other than the plaintiff, it must be false, and it must tend to harm the plaintiff's reputation and to lower him in the estimation of the community." MSK EyEs v. Wells Fargo Bank, 546 F.3d 533, 542 (8th Cir. 2008) (citing

---

[8] In his letter to Dennis Kaemingk, Mr. Piekkola claims to have saved these text and Facebook messages.  Mr. Piekkola did not produce the messages, either to Mr. Kaemingk or this court.

Restatement (Second) of Torts §§ 558-559 (1977); W. Prosser, Handbook of the Law of Torts §§ 111 at 739 (4th ed. 1971)).[9]

As for any claims that the defendants made defamatory statements about him to Karri, in order to prevail on his defamation claim Mr. Piekkola would be required to (1) counter with admissible evidence the defendants' summary judgment affidavits asserting they made no such statements; and (2) even assuming Mr. Piekkola showed, with admissible evidence, that the defendants made the statements he attributes to them—i.e. that he was assaultive, a drug user, and a thief, that those statements were false. Because the making of a false statement is an element of a defamation claim, truth is an affirmative defense. Flugge v. Wagner, 532 N.W.2d 419, 420 (S.D. 1995).

Given the state of the record, Mr. Piekkola would be hard pressed to show that the statements he claims the defendants made (that he was assaultive, a drug user, and a thief) were false. Specifically, Mr. Piekkola was incarcerated at the MDSP in the first place for aggravated assault, and was later re-incarcerated after, among other things, he used drugs, stole Karri's cell phone, and assaulted Karri. See Docket 45-40 and 45-41. For all of these reasons, no genuine issue of material fact remains for trial as to this issue, and this court recommends to the district court that the defendants' motion for summary judgment be granted.

---

[9] There is a very narrow exception to the rule if the plaintiff is compelled to self-publish the defamatory statement to a third party. MSK EyEs 545 F.3d at 542. The exception is inapplicable here.

## CONCLUSION

Based on the foregoing law, facts and analysis, this court respectfully recommends that defendants' motion for summary judgment and amended motion for summary judgment [Docket Nos. 44 and 69] be granted in their entirety and that plaintiff Max Piekkola and plaintiff intervenor Karri Reynold's amended complaint [Docket 19] be dismissed with prejudice.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court. Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

DATED this 17th day of August, 2017.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge